**No. 22-2495**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT**

STATE OF MISSOURI EX REL. ERIC S. SCHMITT,
*Plaintiff-Appellant,*

v.

THE PEOPLE'S REPUBLIC OF CHINA, *et al*.,
*Defendants-Appellees*.

Appeal from the United States District Court for the Eastern District of Missouri, The Hon. Stephen N. Limbaugh, Jr.

# BRIEF OF APPELLANT


ERIC S. SCHMITT
*Attorney General*

Justin D. Smith, MO 63253
*First Assistant Attorney General*
D. John Sauer, MO 58721
*Solicitor General*
*Counsel of Record*

*Attorneys for Plaintiff-Appellant*

OFFICE OF THE MISSOURI
ATTORNEY GENERAL
Supreme Court Building
P.O. Box 899
Jefferson City, Missouri 65102
Phone: 573-751-8870
Fax: 573-751-0774
John.Sauer@ago.mo.gov

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This case involves claims asserted by the Attorney General and State of Missouri on behalf of the people of Missouri against the People's Republic of China and eight other Chinese Defendants. Missouri alleged that Defendants commmitted an egregious course of misconduct by releasing the deadly virus that causes COVID-19 from a commercial laboratory in Wuhan and then aggressively suppressing evidence of human transmission until a global pandemic became inevitable. Missouri alleges that Defendants' misconduct inflicted extensive injury and death, as well as economic and non-economic harms, on the State of Missouri and its citizens. All Defendants were served with process, but they all failed to appear and defaulted. Nevertheless, the district court, acting *sua sponte*, dismissed Missouri's Complaint with prejudice for lack of subject-matter jurisdiction. The district court's decision was profoundly erroneous, and it misapplied both the governing legal standards and binding case law under the Foreign Sovereign Immunities Act (FSIA). Because the case involves complex questions regarding the jurisdictional immunity of foreign sovereigns in a matter of enormous public importance, Missouri respectfully requests 20 minutes of oral argument.

## TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ........... i
TABLE OF CONTENTS ........................................................................... ii
TABLE OF AUTHORITIES ....................................................................... iii
JURISDICTIONAL STATEMENT ...............................................................1
STATEMENT OF THE ISSUES ..................................................................2
STATEMENT OF THE CASE ....................................................................3
STANDARD OF REVIEW .........................................................................7
SUMMARY OF ARGUMENT ....................................................................8
ARGUMENT ..........................................................................................12

I. FSIA Immunity Does Not Apply to Any Defendants Because the Case Falls Within FSIA's "Commercial Activity" Exception. ......................................12

A. The Complaint Alleges "Direct Effects" in the United States. ...........12

B. Missouri's Case Is "Based Upon" Misconduct Committed "In Connection With" a Foreign State's Commercial Activity Abroad. ..........................................................................................23

II. In the Alternative, the Non-Commercial-Tort Exception Applies to Missouri's Complaint. .........................................................................36

III. The Nongovernmental Defendants Are Not Cloaked in FSIA Immunity.....40

A. Defendants Bear the Burden of Proving Foreign-State Status............40

B. Missouri's Complaint Does Not Carry Nongovernmental Defendants' Burden to Show Foreign Statehood. ...............................46

1. The Complaint does not carry CAS's or WIV's burden.................48

2. The Complaint does not carry CPC's burden.................................52

CONCLUSION ..........................................................................................55
CERTIFICATE OF COMPLIANCE ..........................................................56
CERTIFICATE OF SERVICE ...................................................................56

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Adler v. Fed. Republic of Nigeria*,
107 F.3d 720 (9th Cir. 1997) ........................................................ passim

*Aldy ex rel. Aldy v. Valmet Paper Mach*.,
74 F.3d 72 (5th Cir. 1996) ..........................................................................16

*Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc*.,
183 F.3d 1277 (11th Cir. 1999) ..................................................................42

*Antares Aircraft, L.P. v. Fed. Republic of Nigeria*,
999 F.2d 33 (2d Cir. 1993)........................................................................ 14, 15

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
813 F.3d 98 (2d Cir. 2016)..................................................................... 2, 14, 15

*Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*,
734 F.3d 1175 (D.C. Cir. 2013)....................................................................41

*Berkovitz ex rel. Berkovitz v. United States*,
486 U.S. 531 (1988)........................................................................... 37, 38, 39

*Burton v. Stewart*,
549 U.S. 147 (2007).......................................................................................43

*Conroy v. Aniskoff*,
507 U.S. 511 (1993).......................................................................................31

*Croyle ex rel. Croyle v. United States*,
908 F.3d 377 (8th Cir. 2018) ................................................................ 2, 37, 38

*Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of, Can.*, 600 F.3d 661 (D.C. Cir. 2010) ............................................ 13, 14, 17

*Dumont v. Saskatchewan Gov't Ins.*, SGI,
258 F.3d 880 (8th Cir. 2001) ..................................................................... 18, 19

*Effie Film, LLC v. Pomerance*,
909 F. Supp. 2d 273 (S.D.N.Y. 2012) .......................................................53

*Eisenberg v. People's Republic of China Through Wang*,
No. 22-CV-10194-IT, 2022 WL 1591541 (D. Mass. May 19, 2022) .... 32, 33, 44

*Enahoro v. Abubakar*,
408 F.3d 877 (7th Cir. 2005) .......................................................................40



Appellate Case: 22-2495 Page: 4 Date Filed: 10/12/2022 Entry ID: 5206979

*Fagot Rodriguez v. Republic of Costa Rica*,
297 F.3d 1 (1st Cir. 2002) ............................................................................38

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
12 F.3d 1270 (3d Cir. 1993) ..................................................................... 34, 41

*Filler v. Hanvit Bank*,
378 F.3d 213 (2d Cir. 2004) ..................................................................... 48, 52

*Forsythe v. Saudi Arabian Airlines Corp.*,
885 F.2d 285 (5th Cir. 1989) ...........................................................................41

*Garb v. Republic of Poland*,
440 F.3d 579 (2d Cir. 2006) ....................................................................... passim

*Gates v. Victor Fine Foods*,
54 F.3d 1457 (9th Cir. 1995) ...........................................................................52

*Gen. Elec. Cap. Corp. v. Grossman*,
991 F.2d 1376 (8th Cir. 1993) ................................................................... passim

*Gerding v. Republic of France*,
943 F.2d 521 (4th Cir. 1991) ...........................................................................41

*Gerhardson v. Gopher News Co.*,
698 F.3d 1052 (8th Cir. 2012) .........................................................................43

*Gil v. Rodriguez*,
184 F. Supp. 2d 1221 (M.D. Fla. 2002) ...........................................................53

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
602 F.3d 69 (2d Cir. 2010) ..............................................................................21

*Hanil Bank v. Pt. Bank Negara Indonesia (Persero)*,
148 F.3d 127 (2d Cir. 1998) ............................................................................29

*Hickman v. Missouri*,
144 F.3d 1141 (8th Cir. 1998) .........................................................................43

*Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*,
476 U.S. 380 (1986) .........................................................................................43

*Janvey v. Libyan Inv. Auth.*,
840 F.3d 248 (5th Cir. 2016) ................................................................ 2, 47, 48

*Jenisio v. Ozark Airlines, Inc. Ret. Plan for Agent & Clerical Emps*,
178 F.3d 970 (8th Cir. 1999) ...........................................................................43

*Jones v. United States*,
727 F.3d 844 (8th Cir. 2013) ....................................................................43

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016)................................................................................31

*LeMay v. U.S. Postal Serv.*,
450 F.3d 797 (8th Cir. 2006) ......................................................................7

*Lyon v. Agusta S.P.A.*,
252 F.3d 1078 (9th Cir. 2001) ....................................................... 16, 18, 22, 23

*Mont v. United States*,
139 S. Ct. 1826 (2019)..............................................................................36

*OBB Personenverkehr AG v. Sachs*,
577 U.S. 27 (2015)............................................................................... 25, 27

*O'Bryan v. Holy See*,
556 F.3d 361 (6th Cir. 2009) ....................................................................40

*Oncale v. Sundowner Offshore Servs., Inc.*,
523 U.S. 75 (1998)...................................................................................31

*Orient Min. Co. v. Bank of China*,
506 F.3d 980 (10th Cir. 2007) ..................................................................40

*Patrickson v. Dole Food Co.*,
251 F.3d 795 (9th Cir. 2001) ....................................................................48

*Prowse v. Payne*,
984 F.3d 700 (8th Cir. 2021) ....................................................................43

*Qatar v. First Abu Dhabi Bank PJSC*,
432 F. Supp. 3d 401 (S.D.N.Y. 2020) ......................................................41

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)......................................................................... 2, 12, 13, 24

*Richardson v. BNSF Ry.*,
2 F.4th 1063 (8th Cir. 2021) .....................................................................43

*Rote v. Zel Custom Mfg. LLC*,
816 F.3d 383 (6th Cir. 2016) ............................................................... passim

*Ruan v. United States*,
142 S. Ct. 2370 (2022)..............................................................................42

*Samantar v. Yousuf*,
560 U.S. 305 (2010)..................................................................................47

*Saudi Arabia v. Nelson*,
507 U.S. 349 (1993) ........ passim

*Schubarth v. Fed. Republic of Germany*,
891 F.3d 392 (D.C. Cir. 2018) ........ 41

*Tachiona v. United States*,
386 F.3d 205 (2d Cir. 2004) ........ 52

*Thomas v. Superintendent*,
136 F.3d 227 (2d Cir. 1997) ........ 43

*Tonelli v. United States*,
60 F.3d 492 (8th Cir. 1995) ........ 37, 39

*United States v. Gaubert*,
499 U.S. 315 (1991) ........ 2, 36, 37

*USX Corp. v. Adriatic Ins.*,
345 F.3d 190 (3d Cir. 2003) ........ 48, 50

*Verlinden B.V. v. Cent. Bank of Nigeria*,
461 U.S. 480 (1983) ........ 32

*Vermeulen v. Renault, U.S.A., Inc.*,
985 F.2d 1534 (11th Cir. 1993) ........ 15, 18

*Virtual Countries, Inc. v. Republic of South Africa*,
300 F.3d 230 (2d Cir. 2002) ........ 21, 22, 40

*Wye Oak Tech., Inc. v. Republic of Iraq*,

666 F.3d 205 (4th Cir. 2011) ........ 49

*Zean v. Fairview Health Servs.*,
858 F.3d 520 (8th Cir. 2017) ........ 51

**Statutes**

28 U.S.C. §1291 ........ 1
28 U.S.C. §1330 ........ 1
28 U.S.C. §1603 ........ passim
28 U.S.C. §1605(a)(2) ........ passim
28 U.S.C. §1605(a)(5) ........ passim
28 U.S.C. §1332(a)(2) ........ 1
28 U.S.C. §1367(a) ........ 1
28 U.S.C. §1604 ........ 2
29 U.S.C. §151 ........ 43

45 U.S.C. §151 ........................................................................................43

**Other Authorities**

David A. Brittenham, Note, *Foreign Sovereign Immunity and Commercial Activity: A Conflicts Approach*, 83 Colum. L. Rev. 1440 (1983)........................31
H.R. Rep. No. 94–1487, reprinted in 1976 U.S.C.C.A.N. at 6613..........................47
Restatement of Conflict of Laws §377 (1934)........................................................14
*SARS-CoV-2 and NIAID-supported Bat Coronavirus Research*, NAT'L INST. OF HEALTH (2021) ..............................................................................................51
*Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US*, FOX NEWS (Apr. 15, 2020)......................................14
Xiaoxuan Li et al., *Scientific Advice in China: the Changing Role of the Chinese Academy of Sciences*, PALGRAVE COMMUNICATIONS (July 12, 2016)................46



Appellate Case: 22-2495 Page: 8 Date Filed: 10/12/2022 Entry ID: 5206979

## JURISDICTIONAL STATEMENT

This case involves claims brought by the State of Missouri and its citizens against the People's Republic of China, five of its political subdivisions, and three non-governmental entities based in China. App. 9; R. Doc. 1, at 1.[1] The district court had jurisdiction over claims against all Defendants that are foreign states under 28 U.S.C. § 1330, and jurisdiction over claims against non-foreign-state Defendants under 28 U.S.C. §§ 1332(a)(2) and 1367(a). On July 8, 2022, the district court entered a final judgment dismissing the case with prejudice *sua sponte* for lack of subject-matter jurisdiction. Add. 39, R. Doc. 62. The same day, July 8, 2022, Missouri filed a timely notice of appeal. App. 8, R. Doc. 63. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

---

[1] As used herein, "Add." refers to the Appellant's Addendum containing the district court's opinion, and "App." refers to the Appellant's Appendix.



Appellate Case: 22-2495 Page: 9 Date Filed: 10/12/2022 Entry ID: 5206979

## STATEMENT OF THE ISSUES

I. Whether Missouri's claims against all Defendants fall within the "commercial activities" exception to foreign sovereign immunity provided in the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1605(a)(2).

- *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992)
- *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98 (2d Cir. 2016)
- *Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383 (6th Cir. 2016)
- *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997).

II. Whether, in the alternative, Missouri's claims against all Defendants fall within the "non-commercial activities" exception to foreign sovereign immunity provided in the FSIA, 28 U.S.C. § 1605(a)(5).

- *United States v. Gaubert*, 499 U.S. 315 (1991)
- *Croyle ex rel. Croyle v. United States*, 908 F.3d 377 (8th Cir. 2018)

III. Whether the non-governmental Defendants—Chinese Academy of Sciences, Wuhan Institute of Virology, and Communist Party of China—constitute "foreign state[s]" within the meaning of the FSIA, 28 U.S.C. §§ 1603, 1604.

- *Gen. Elec. Cap. Corp. v. Grossman*, 991 F.2d 1376 (8th Cir. 1993)
- *Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2006)
- *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248 (5th Cir. 2016)

## STATEMENT OF THE CASE

In January 2020, the world become aware of the outbreak of a new contagious disease, COVID-19, in Wuhan, China. The virus that caused that disease, SARS-CoV-2, was highly transmissible. On January 20, 2021, Chinese authorities admitted for the first time that the disease was capable of human-to-human transmission. App. 35; R. Doc. 1, ¶ 109. The first confirmed case of COVID-19 in the United States was detected the next day, meaning that the disease was already afoot in the United States when the critical admission was made. *See* CDC, Press Release, *First Travel-Related Case of 2019 Novel Coronavirus Detected in United States* (Jan. 21, 2020), *at* https://www.cdc.gov/media/releases/2020/p0121-novel-coronavirus-travel-case.html. The virus spread rapidly, sickening and killing hundreds, then thousands, then millions of people, including many Americans. By April 20, 2020, "Missouri had more than 5,800 confirmed infections from COVID-19, and more than 177 Missourians had died, with these numbers increasing on a daily basis." App. 10; R. Doc. 1, ¶ 3.

On April 21, 2020, Missouri Attorney General Eric S. Schmitt filed suit against the People's Republic of China and eight other Chinese defendants, alleging that they were legally responsible for the outbreak and spread of COVID-19. App. 9–10; R. Doc. 1, at 1–2. Defendants included six governmental entities: the People's Republic of China (PRC); its National Health Commission, Ministry of Emergency

Management, and Ministry of Civil Affairs; the People's Government of Hubei Province, and the People's Government of Wuhan City. App. 13–15; R. Doc. 1, ¶¶ 17–26. Defendants included three non-governmental entities: the Communist Party of China (CPC), the Chinese Academy of Sciences (CAS), and the Wuhan Institute of Virology (WIV). App. 15–16; R. Doc. 1, ¶¶ 27–34.

As relevant here, the Complaint alleged a single course of misconduct that included three main elements. *First*, Missouri alleged that, due to Defendants' misfeasance, the deadly virus had escaped from a laboratory conducting commercial research on viruses operated by the Wuhan Institute of Virology and other Defendants in Wuhan, China. App. 20; R. Doc. 1, ¶ 52. The Complaint alleged that an "emerging theory on the origin of the virus is that it was released from the Wuhan Institute of Virology, which was studying the virus as part of a commercial activity." *Id.* It alleged that "Defendants engaged in commercial and other research on coronaviruses through the Wuhan Institute," a lab with "known safety concerns," and that a "likely source" of the virus was the WIV lab. App. 47; R. Doc. 1, ¶¶ 152–53. It alleged that "Defendants have engaged in a coverup about the origins of the virus, *including its release from the Wuhan Institute*." App. 47; R. Doc. 1, ¶ 157 (emphasis added). And it alleged that this commercial research on viruses was abnormally dangerous activity, resulting in strict liability for the virus's release. App. 45–48; R. Doc. 1, ¶¶ 149–62.



Appellate Case: 22-2495 Page: 12 Date Filed: 10/12/2022 Entry ID: 5206979

*Second*, the Complaint alleged that, once the virus had escaped from the WIV's commercial lab in Wuhan, Defendants engaged in an extensive campaign of misfeasance that permitted the virus to spread, rendering its transmission to the United States inevitable. The Complaint alleged that Defendants allowed millions of people to travel through Wuhan during the virus's initial outbreak. App. 19–37; R. Doc. 1, ¶¶ 47–115. During this time period, Defendants suppressed critical information about the virus's transmissibility, concealing from the world the virus's dangers during the critical period of initial spread. App. 26–33; R. Doc. 1, ¶¶ 77–102. Defendants did so by concealing critical scientific information, arresting whistleblowers, silencing social-media criticism, and suppressing information from the healthcare system in Wuhan. *Id.*

*Third*, the Complaint alleged that, while Defendants were concealing critical information about the virus, Defendants profited off the world's ignorance by engaging in an international hoarding scheme to buy up the personal protective equipment (PPE) that medical providers would use in treating COVID-19, including from the United States, and selling and shipping low-quality PPE into the United States at massive profit margins. App. 40–42; R. Doc. 1, ¶¶ 130–138. Defendants engaged in a "deliberate attempt by China to corner the market as it concealed and downplayed the danger posed by the outbreak," which included purchasing high-quality PPE directly from the United States, and then selling low-quality PPE into

the United States once medical needs skyrocketed, in a manner that "impaired the ability of health care providers throughout the world, including in the United States and in Missouri, from safely and effectively treating patients with the virus." App. 42; R. Doc. 1, ¶ 138.

All Defendants were served with the Complaint, failed to appear, and had clerk's defaults entered against them. App. 3–7. After calling for supplemental briefing, the district court issued an opinion and order dismissing the case with prejudice *sua sponte* for lack of subject-matter jurisdiction. Add. 31-39; R. Doc. 61-62. Missouri timely appealed.

## STANDARD OF REVIEW

"A district court's dismissal of a complaint for lack of subject matter jurisdiction is subject to de novo review." *LeMay v. U.S. Postal Serv.*, 450 F.3d 797, 799 (8th Cir. 2006).

## SUMMARY OF ARGUMENT

I. Missouri's Complaint falls within the third clause of the "commercial activity" exception in 28 U.S.C. § 1605(a)(2), which exempts from FSIA immunity any "action based upon … an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." The Complaint alleges that Defendants released a deadly virus from a commercial laboratory in Wuhan, permitted millions of people to pass through Wuhan while suppressing and concealing the virus's transmissibility, and then profiteered off the nascent pandemic that they caused by engaging in a PPE-hoarding scheme.

First, the Complaint alleges "direct effects" in the United States. It alleges extensive personal injuries and deaths inflicted in the United States. The locus of a tort is the place of injury, and here, the injuries were first inflicted and felt in the United States, so that is the place of the torts' "direct effects." Courts "routinely" hold that defective products that inflict injuries in the United States, even years after they were first placed in the stream of international commerce, cause "direct effects" in the United States. Here, a deadly, highly transmissible virus was released, Defendants took steps to ensure that its transmission to the United States would be inevitable, and it did travel to the United States where it sickened or killed millions

of people. These are "direct effects" in the United States, or else the exception means nothing at all.

Second, Missouri's claims are "based upon" actions performed "in connection with a commercial activity of the foreign state elsewhere." The Complaint alleges four kinds of commercial activity: (1) commercial research on viruses at the Wuhan Institute of Virology; (2) operation of healthcare systems in Wuhan and elsewhere in China; (3) operation of traditional and social-media platforms for commercial gain; and (4) purchasing and selling PPE, including purchasing from and shipping into the United States. The Complaint alleges a course of misconduct with three main elements: (1) releasing the virus from the WIV's commercial lab, (2) permitting the virus to spread by allowing millions to travel through Wuhan while suppressing and concealing evidence of the virus's transmissibility, and (3) hoarding high-quality PPE and exporting defective PPE during the outbreak's initial stages. The district court erroneously focused only on the second of these elements, but all three are central to the Complaint's "gravamen." In any event, all this misconduct was conducted "in connection with" the foreign state's commercial activity abroad, because all had a clear and manifest "substantive connection" or "causal link" to the commercial activities identified in the Complaint. Indeed, much of the alleged misconduct is itself commercial activity—such as conducting ultrahazardous research on human viruses for commercial gain.

II. In the alternative, Missouri's Complaint falls within the "non-commercial activity" exception in 28 U.S.C. § 1605(a)(5). The district court held that releasing a deadly virus and suppressing evidence of the outbreak until a global pandemic was inevitable fell within the "discretionary function" exception of § 1605(a)(5)(A). But that exception applies only to conduct that involves the "permissible exercise of policy judgment," and it does not apply where "no conceivable policy choice" would allow the alleged misconduct. Here, viewed in the light most favorable to Missouri, the Complaint alleges misconduct that lies far outside any permissible exercise of policy judgment and that no conceivable policy choice would allow—such as releasing a deadly, highly contagious virus from a commercial laboratory, and then engaging in an aggressive campaign of misfeasance to suppress knowledge of the virus's release and transmissibility.

III. The district court also erred by treating the non-governmental Defendants—CPC, CAS, and WIV—as "foreign states" cloaked in FSIA immunity. Under this Court's case law and the law of nine other Circuits, Missouri had no burden to plead facts establishing that these Defendants are *not* "foreign states"—that burden lay on Defendants in the first instance. No Defendant carried that burden, because all Defendants defaulted after being served with process. And, contrary to the district court's reasoning, the allegations in Missouri's Complaint did not carry these Defendants' burden for them. The Complaint does not include any allegations that

would establish that CPC, CAS, or WIV is a "foreign state," as that term is defined in 28 U.S.C. § 1603(a), (b). These entities are not "foreign state[s]" themselves, because the People's Republic of China (PRC) is the "foreign state." They are not "political subdivisions" of the PRC because they are not "governmental units beneath the central government, including local governments," and the Complaint does not allege that they are. They are not "organs" of a foreign state (and thus not "agencies or instrumentalities" of a foreign state, 28 U.S.C. § 1603(b)(2)) because Missouri did not allege any facts that would establish that they satisfy any of the various multi-factor tests for determining whether something constitutes an "organ" of a foreign state. Missouri had no burden to allege facts about the foreign-state status of CPC, CAS, or WIV, and Missouri did not do so. Under controlling law, the burden fell on those Defendants to come forward with facts establishing that they are "foreign states" cloaked with FSIA immunity. They did not do so. Instead, they defaulted, and the district court erred by dismissing Missouri' Complaint, *sua sponte*, in their absence.



Appellate Case: 22-2495 Page: 19 Date Filed: 10/12/2022 Entry ID: 5206979

## ARGUMENT

### I. FSIA Immunity Does Not Apply to Any Defendants Because the Case Falls Within FSIA's "Commercial Activity" Exception.

The "commercial activity" exception to foreign sovereign immunity provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … in which the action is *based … upon* an act outside the territory of the United States *in connection with* a commercial activity of the foreign state elsewhere and that act causes a *direct effect* in the United States." 28 U.S.C. § 1605(a)(2) (emphases added). This case falls squarely within this exception.

#### A. The Complaint Alleges "Direct Effects" in the United States.

The district court held that Defendants' alleged misfeasance in unleashing of the COVID-19 pandemic upon the world had no "direct effect" in the United States. Add. 33; R. Doc. 61, at 33. The court reasoned that Defendants' conduct of releasing a highly contagious virus and then engaging in campaign of deceit and malfeasance in the critical initial weeks of the virus's outbreak—thus unleashing and rendering inevitable the global COVID-19 pandemic that killed hundreds of thousands of Americans—had no "direct effect" in the United States. This reasoning lacks merit.

In defining what constitutes a "direct effect," the Supreme Court has "reject[ed] the suggestion that § 1605(a)(2) contains any unexpressed requirement of 'substantiality' or 'foreseeability.'" *Republic of Argentina v. Weltover, Inc.*, 504



Appellate Case: 22-2495 Page: 20 Date Filed: 10/12/2022 Entry ID: 5206979

U.S. 607, 618 (1992). Rather, under FSIA, "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's activity.'" *Id.* (cleaned up). Effects that are "too speculative" or "too remote and attenuated" do not "satisfy the 'direct effect' requirement." *Id.* In *Weltover*, the Supreme Court had "little difficulty concluding that Argentina's unilateral rescheduling of the maturity dates" of Argentina-issued bonds had a "direct effect" in the United States, because it delayed payments that otherwise would have been deposited in the United States—*i.e.*, the injury from the allegedly wrongful conduct was directly felt in the United States. *Id.* at 618–19. Where the defendants' conduct "led inexorably to" an injury or loss in the United States, the "direct effect" test is satisfied. *Cruise Connections Charter Mgmt. 1, LP v. Att'y Gen. of Can.*, 600 F.3d 661, 665 (D.C. Cir. 2010).

The Complaint repeatedly and plausibly alleges that Defendants' conduct in unleashing the COVID-19 pandemic had "direct effect[s]" in the United States. *E.g.*, App. 11; R. Doc. 1, ¶ 5 ("This COVID-19 pandemic is the direct result of a sinister campaign of malfeasance and deception carried out by Defendants."); App. 12; R. Doc. 1, ¶ 12 (alleging that Missouri has sustained "direct and substantial injuries and losses" from Defendants' conduct); App. 12; R. Doc. 1, ¶ 13 (alleging injuries to Missouri's "own economic and proprietary interests that it has directly suffered due to the actions of Defendants"); App. 17–18; R. Doc. 1, ¶ 40 (alleging "direct effect[s]" from identified commercial activities of Defendants); App. 38; R. Doc. 1,

¶ 122 (alleging "direct economic losses" to Missouri's government entities); *see also* App. 38–40; R. Doc. 1, ¶¶ 123–29 (alleging extensive personal injuries as direct effects on Missouri citizens). Among other things, the Complaint alleges that, while suppressing their knowledge of human-to-human transmission, Defendants permitted millions of people to travel in and out of Wuhan during the Chinese New Year, many of whom became infected and traveled directly to the rest of the world, including the United States—thus rendering a global pandemic inevitable. App. 25–26; R. Doc. 1, ¶¶ 73–76. The Complaint thus alleges that Defendants' conduct in unleashing and covering up the virus "led inexorably to" these injuries in the United States and Missouri. *Cruise Connections*, 600 F.3d at 665.

Where, as here, the Complaint asserts tort claims and alleges "direct effects" in the United States that include *the personal injuries inflicted by those torts*, the "direct effect" test is satisfied. FSIA's "direct effect" prong is satisfied if the "locus" of the tort was in the United States—*i.e.*, when the injury complained of occurred in the United States. *See, e.g.*, *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 109 (2d Cir. 2016) (citing *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 999 F.2d 33, 36 (2d Cir. 1993)). "A tort's locus … is the place 'where the last event necessary to make an actor liable for an alleged tort takes place.'" *Id.* (citing Restatement of Conflict of Laws § 377 (1934)). "And since a tort action traditionally has not been viewed as complete until the plaintiff suffers

injury or loss, the cause of action has generally been considered to arise at the place where this damage was sustained." *Id.* (cleaned up). "Thus, a determination that a tort's locus is the United States is, in effect, often a determination that the plaintiff has been injured in this country by the defendant's tortious actions—*meaning that those actions caused a 'direct effect' (the plaintiff's injury) in this country*." *Id.* (emphasis added). "As a result, such a determination will ordinarily be sufficient, if not invariably necessary, to confer FSIA jurisdiction…." *Id.* (citing cases). In other words, when Defendants' tortious conduct caused personal injuries that were inflicted and felt in the United States—which the Complaint here plainly alleges—that causation satisfies the "direct effect" prong of 28 U.S.C. § 1605(a)(2). *Id.*; *see also, e.g.*, *Antares Aircraft*, 999 F.2d at 36.

For this reason, courts routinely hold that defective products manufactured abroad, which injure consumers in the United States after traveling extensively in international commerce, satisfy the "direct effects" test. For example, in *Rote v. Zel Custom Mfg. LLC*, the Sixth Circuit held that a piece of faulty ammunition manufactured in Argentina had a "direct effect" in the United States when it exploded and injured a man in Ohio. 816 F.3d 383, 396 (6th Cir. 2016). The Sixth Circuit noted that, "in the context of product-liability cases, courts have routinely held that an injury caused by an allegedly defective product meets the 'direct effect' element." *Id.*; *see also Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1545

(11th Cir. 1993) (holding that an injury in Georgia from a defective automobile manufactured in France was a "direct effect" of foreign commercial activity, because "[w]e can hardly imagine a more immediate consequence of the defendant's activity"); *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1083–84 (9th Cir. 2001) (holding that it was "pellucid" that deaths in the United States from a defective aircraft manufactured abroad were "direct effects" of the foreign commercial activity); *Aldy ex rel. Aldy v. Valmet Paper Mach.*, 74 F.3d 72, 75 (5th Cir. 1996) (holding that deaths in the United States from a defective paper machine manufactured in Finland were "direct effects" of foreign commercial activity). In all these cases, where the *personal injury was inflicted* within the United States, the "direct effects" test was plainly satisfied. And these cases are directly analogous to Defendants' conduct: Just as these defective products traveled in international commerce before inflicting "direct effects" in the United States, so also did the deadly virus that Defendants released and concealed.

In fact, the causal chain alleged in the Complaint is far more direct and immediate than the causal chain these defective-product cases, where "courts have routinely held that an injury caused by an allegedly defective product meets the 'direct effect' element." *Rote*, 816 F.3d at 396. The release of a defective product into the stream of international commerce might or might not ever injure an American consumer—and "many intervening events would necessarily have

occurred before" it does. Add. 33; R. Doc. 61, at 33. By contrast, once Defendants had permitted literally millions of people to travel through Wuhan, where the highly contagious virus was widely circulating, and return to other countries—including directly to the United States—the consequences were clear, immediate, and "inexorabl[e]." *Cruise Connections*, 600 F.3d at 665.

The district court sought to distinguish these defective-product cases on the ground that "[e]ven if the product was used for some time before the defect caused the injury, the defectively manufactured product itself was the immediate cause of the injuries." Add. 35; R. Doc. 61, at 35. But this reasoning *underscores*, not undermines, the applicability of the defective-product cases. The Complaint plausibly alleges that the Defendants accidentally released a bioengineered, highly contagious virus in Wuhan, then engaged in a pattern of misfeasance to conceal the outbreak until it was too late to prevent a global pandemic. App. 20–37, 47; R. Doc. 1, ¶¶ 52–115, 152–57. The district court's reasoning directly applies to these facts: "Even if the [virus] was [transmitted] for some time before the defect caused the injury, the [bioengineered virus] itself was the immediate cause of the injuries." Add. 35; R. Doc. 61, at 35.

In addition, the district court reasoned that "the time frame alone shows the lack of immediacy as weeks passed between the core misconduct and when COVID cases reached United States shores." Add. 34; R. Doc. 61, at 34. This statement is



Appellate Case: 22-2495 Page: 25 Date Filed: 10/12/2022 Entry ID: 5206979

both factually erroneous and legally irrelevant. As a matter of fact, the first confirmed case of COVID-19 in the United States was on January 21, 2020—*one day after* Chinese authorities first admitted that person-to-person transmission was occurring, as the Complaint clearly points out. App. 35; R. Doc. 1, ¶ 109. And as a matter of law, the mere passage of time makes no difference to the "direct effects" test if the personal injury is first inflicted in the United States. It is common for foreign products to spend years in international commerce before injuring an American consumer. *See, e.g.*, *Lyon*, 252 F.3d at 1081 (twenty-three years elapsed between allegedly defective product's manufacture in 1970 and the injury in 1993); *Vermueulen*, 985 F.2d at 1537 (six years elapsed between the product's allegedly defective design and manufacture in 1982, and the injury from the defect in 1988). Yet courts "routinely" find that the direct-effects test is satisfied in such cases. *Rote*, 816 F.3d at 396.

This Court's case law is consistent with this well-founded principle. For example, in *Dumont v. Saskatchewan Gov't Ins.*, SGI, a subsidiary of the Canadian government, provided insurance coverage to Canadian citizens who were killed in a car accident in North Dakota. 258 F.3d 880, 881–83 & n.6 (8th Cir. 2001). The Canadian victims' survivors sued SGI in North Dakota to compel the Canadian governmental insurer to pay their wrongful-death claims. Where the locus of the underlying tort was in the United States—*i.e.*, fatal injuries in the car crash—this



Appellate Case: 22-2495 Page: 26 Date Filed: 10/12/2022 Entry ID: 5206979

Court held that the "direct effect" test of the commercial activities exception was satisfied, with "[t]he direct effect being the provision of automobile liability and family security insurance coverage to [the Canadian car-accident victims] while they traveled by automobile in the United States." *Id.* This was true even though the lawsuit raised insurance-coverage claims that arose at a step removed from the underlying tort claims. *See id.* Here, by contrast, the "direct effects" are injuries arising directly from the alleged torts, so the "direct effects" test is even more clearly satisfied.

The Complaint also alleges "direct effects" in the United States from Defendants' PPE-hoarding scheme. The Complaint alleges that, at the outset of the pandemic, Defendants both "stop[ped] selling" medical-grade personal protective equipment ("PPE") outside China and "bought up much of the rest of the world's supply." App. 41; R. Doc. 1, ¶ 132. These "hoarding efforts" resulted in the net importation of much of the world's supply of quality PPE. App. 41; R. Doc. 1, ¶¶ 133–34. In addition to buying up quality PPE, Defendants also deliberately sold "faulty" PPE and "defective equipment" to the rest of the world, including the United States. App. 42; R. Doc. 1, ¶ 136. This "hoarding of PPE" was designed "to profit from the increased worldwide demand for PPE during the viral outbreak." App. 42; R. Doc. 1, ¶ 137.



Appellate Case: 22-2495 Page: 27 Date Filed: 10/12/2022 Entry ID: 5206979

These actions of purchasing quality PPE and selling defective PPE directly affected the United States, including Missouri, both by profiteering on sales and by "impair[ing] the ability of health care providers throughout the world, including in the United States and Missouri, from safely and effectively treating patients with the virus." App. 42; R. Doc. 1, ¶ 138. The Complaint alleges that Defendants "allowed the export of ineffective PPE, all the while knowing (and even suppressing) the dangers of COVID-19," App. 52; R. Doc. 1, ¶ 175; and that Defendants "provide[d] ineffective PPE to medical providers," and in doing so "caused injury across the state of Missouri," App. 52; R. Doc. 1, ¶ 176.

This PPE-hoarding scheme caused "direct effect[s]" in the United States. When Defendants purchased large quantities of high-quality PPE from the United States, they directly caused such PPE to be unavailable in the United States right as the pandemic hit. And when Defendants sold defective PPE into the United States, they directly caused health-care providers in the United States to suffer the consequences of treating patients with defective equipment.

The district court disregarded the "direct effects" of the PPE-hoarding scheme because it "d[id] not view the PPE hoarding as the core of the complaint." Add. 34; R. Doc. 61, at 34. This analysis is based on an artificially narrow reading of the Complaint's "core" or "gravamen," discussed further below. *See infra*, Part I.B.



Appellate Case: 22-2495 Page: 28 Date Filed: 10/12/2022 Entry ID: 5206979

The district court also cited four cases to conclude that there was no "direct effect" here. Add. 28; R. Doc. 61, at 28. None of these cases supports the district court's conclusion.

First, *Guirlando* was an action against a Turkish bank for wrongfully allowing the plaintiff's spouse to withdraw funds "from a newly established bank account in Turkey." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 71 (2d Cir. 2010). It did not involve any personal injury, and the financial injury was inflicted abroad—*i.e.*, "in Turkey." *Id.* The Second Circuit held that "'the requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state.'" *Id.* at 75 (citation omitted). Thus, *Guirlando* was a case where the injury was purely financial and that injury was inflicted abroad, and any financial effects in the United States were causally downstream from, and based on variables independent of, the misfeasance in Turkey. *Id.* at 71.

*Virtual Countries*, likewise, was a dispute about purely economic injuries inflicted abroad with indirect effects in the United States. In *Virtual Countries*, the plaintiff sued the Republic of South Africa for issuing a press release in South Africa claiming the domain name southafrica.com, which the plaintiff also claimed. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 234 (2d Cir. 2002). The Second Circuit held that "the press release's effect falls at the end of a long chain of causation and is mediated by numerous actions by third parties," which included



Appellate Case: 22-2495 Page: 29 Date Filed: 10/12/2022 Entry ID: 5206979

independent decisions of "potential investors … and a potential strategic business partner" who "formed their own independent assessments of the Republic's intentions and the possible effect of those intentions on Virtual Countries." *Id.* The case involved financial wrongs inflicted abroad whose alleged effects were mediated through a contingent and "speculat[ive]" causal chain. *Id.*

*Lyon*, which the district court also cited, Add. 28; R. Doc. 61, at 28, directly supports Missouri. As noted above, *Lyon* involved a defective aircraft that crashed in California 23 years after it was manufactured in Italy by Marchetti, an instrumentality of the Italian government. 252 F.3d at 1081. "The airplane had originally been sold by Marchetti in December of 1970 to SA Sabena N.V. in Belgium and had, after intervening transfers, become the property of the owner of the craft at the time of the crash." *Id.* Despite the "intervening transfers" over 23 years, the court held that the injuries inflicted by the plane crash in California were "direct effects." *Id.* The court held that the question "should focus on whether some intervening act broke the chain of causation leading from the asserted wrongful act to its impact in the United States." *Id.* at 1083. Notably, because the product was potentially deadly from the beginning, the aircraft's "intervening transfers" and transmission in international commerce were *not* "intevening act[s]" that "broke the chain of causation." *Id.* Rather, the court reasoned, "it is pellucid that the line between the defective production of the aircraft and the failure of that product

because of the defect was a straight one." *Id.* So also here, the virus was deadly from the beginning, and the fact that it was transmitted by infected travelers in international commerce—just like the aircraft in *Lyon*—did not "br[eak] the chain of caustion." *Id.*

Finally, the district court cited *General Electric Capital Corp. v. Grossman*, 991 F.2d 1376, 1378 (8th Cir. 1993). This is another case where the "direct effects" were downstream economic effects from a financial transaction occurring abroad. *General Electric* involved claims of misrepresentation surrounding the acquisition of a Canadian corporation in Canada. "The accounting improprieties … all occurred in Canada. The acts which form the basis of the suit … occurred primarily in Canada." *Id.* at 1383. The direct financial consequences of the allegedly fraudulent deal, therefore, were inflicted in Canada: "[T]he effect of Air Canada's actions was that Gelco received too much money for Express.… Air Canada's alleged acts of concealment … occurred in Canada. There was no direct effect in the United States." *Id.* The "direct effect test [was] not satisfied when there was no direct financial loss in the United States." *Id.* Here, where the alleged injuries include personal injury and death first inflicted felt in the United States, not China, the "direct effect" test is satisfied.

**B. Missouri's Case Is "Based Upon" Misconduct Committed "In Connection With" a Foreign State's Commercial Activity Abroad.**

As noted above, the third clause of 28 U.S.C. § 1605(a)(2) provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case … (2) in which the action is based upon … an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." Here, Missouri's action is "based upon" acts committed "in connection with a commercial activity of the foreign state elsewhere."

***"Commercial activity."*** Missouri pleaded that its claims were based upon conduct in connection with four "commercial activities":

> (1) operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ("PPE"), used in COVID-19 efforts.

App. 17–18; R. Doc. 1, ¶ 40 (quoted in Add. 29; R. Doc. 61, at 29). The district court "assume[d] for the sake of argument that the[se] identified activities are commercial." Add. 29; R. Doc. 61, at 29. This assumption, moreover, was plainly correct, as these are all "commercial activities." *See Weltover*, 504 U.S. at 614.

"***Based upon.***" The phrase "based upon" in § 1605 "is read most naturally to mean those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Saudi Arabia v. Nelson*, 507 U.S. 349, 357 (1993). Under *Nelson*, the "focus should be on the 'gravamen of the complaint,'" and that

"[a]n action is based upon the elements that prove the claim, no more and no less." *Id.* (citations omitted). By contrast, an action is not "based upon" "facts [that] alone entitle the [plaintiffs] to nothing under their theory of the case." *Id.* at 358. "*Nelson* … teaches that an action is 'based upon' the 'particular conduct' that constitutes the 'gravamen' of the suit. Rather than individually analyzing each of the Nelsons' causes of action, [the Court] zeroed in on the core of their suit: the Saudi sovereign acts that actually injured them." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 35 (2015).

Applying this test, the district court held that "the gravamen of the complaint—the actual conduct that injured plaintiff—is that defendants failed to contain the virus within Wuhan, and later within PRC's borders, while lying to its citizens and the world about the transmissibility of the virus and delaying, censoring, or withholding critical information about the virus." Add. 30; R. Doc. 61, at 30. The district court's description of the Complaint's "gravamen" is artificially narrow because it excludes, without explanation or justification, two critical aspects of Defendants' course of misconduct that are equally central to Plaintiffs' case: (1) the release of the deadly virus from the WIV's lab, and (2) the leveraging of the world's ignorance due to their suppression into a PPE-hoarding scheme.

The Complaint alleges that the virus had escaped from the WIV laboratory in Wuhan. App. 47; R. Doc. 1, ¶¶ 152–57; *see also* App. 11, 15, 20; R. Doc. 1, ¶¶ 4,

6, 27–30 & n.3 (citing an article headlined, "US officials confirm full-scale investigation of whether coronavirus escaped from Wuhan lab"), 52 & n.8 (citing a news article headlined, "Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US"). The Complaint alleges that Defendants' "coverup" (which the district court viewed as the "gravamen" of the Complaint) extended to "the origins of the virus, *including its release from the Wuhan Institute*." App. 47; R. Doc. 1, ¶ 157 (emphasis added). This lab-leak allegation provided the principal basis for Count II of the four-count Complaint (Abnormally Dangerous Activities – Strict Liability), App. 47–48; R. Doc. 1, ¶¶ 152–62. It also provided an important part of the basis for Count III (Breach of Duty: Allowing Transmission of COVID-19). App. 50, 51; R. Doc. 1, ¶¶ 166, 172.

The Complaint also alleged that Defendants engaged in a PPE-hoarding scheme that leveraged their campaign of concealment and the world's ignorance to hoard much of the world's supply of PPE in the pandemic's earliest days, directly injuring Missourians. App. 40–42; R. Doc. 1, ¶¶ 130–38. This PPE-hoarding misconduct formed the principal basis of Count IV of the Complaint (Breach of Duty: Hoarding of Personal Protective Equipment). App. 52–53; R. Doc. 1, ¶¶ 174–81. It also formed an important part of the basis for Count I, *see* App. 44; R. Doc. 1, ¶ 144; and Count II, App. 47–48; R. Doc. 1, ¶ 158.

These additional allegations satisfy *Nelson*'s criteria for inclusion in the "gravamen" of the Complaint. They are part of "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." *Nelson*, 507 U.S. at 357. Indeed, they are absolutely central to two of the four Counts—Count II (which alleges the lab-leak theory as strict liability for abnormally dangerous activities) and Count IV (which alleges breach of duty based on the PPE-hoarding conduct). They also constitute "sovereign acts that actually injured [Plaintiff]," *Sachs*, 577 U.S. at 35, because the accidental release from the lab was probably the most critical event in causing Plaintiffs' injuries, and the PPE-hoarding conduct inflicted unique injuries of its own, as the Complaint alleges. App. 40–42, 52–53; R. Doc. 1, ¶¶ 130–38, 175–81. These facts are the antithesis of "facts [that] alone entitle the [Plaintiff] to nothing under [its] theory of the case." *Nelson*, 507 U.S. at 358. By "zeroing in" on Defendants' failure to *contain* the virus while concealing its transmission from the world—and excluding the *release* of the virus and the profiteering off the virus—the district court "zeroed in" too far, and artificially excluded critical facts that equally lie at the "core" of Plaintiff's suit. *Sachs*, 577 U.S. at 35.

The district court expressed the concern that including the lab-leak allegations and the PPE-hoarding allegations in the "gravamen" of the case could lead to "artful pleading." Add. 32; R. Doc. 61, at 32. This concern is inapplicable. *Nelson*



Appellate Case: 22-2495 Page: 35 Date Filed: 10/12/2022 Entry ID: 5206979

expressed concern about "artful pleading" when the plaintiff included a failure-to-warn claim that essential re-cast on the claims of misconduct occurring in Saudi Arabia. *Nelson*, 507 U.S. at 363. The Supreme Court stated that "a plaintiff could recast virtually any claim of intentional tort committed by sovereign act as a claim of failure to warn, simply by charging the defendant with an obligation to announce its own tortious propensity before indulging it. To give jurisdictional significance to this feint of language would effectively thwart the Act's manifest purpose to codify the restrictive theory of foreign sovereign immunity." *Id.* Here, the allegations that the virus was released from a commercial lab operated by WIV, and that Defendants profiteered off the world's ignorance through the PPE-hoarding scheme, do not merely re-cast the concealment allegations through "feint of language." *Id.* On the contrary, they are distinct factual allegations that provide independent bases for liability and constitute equally important aspects of the overall course of misconduct.

***"In connection with."*** Courts have held that "[t]o satisfy the 'in connection with' requirement, the acts complained of must have some "substantive connection" or a 'causal link' to the commercial activity." *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 726 (9th Cir. 1997). "Acts are 'in connection' with ... commercial activity so long as there is a 'substantive connection' or a 'causal link' between them and the commercial activity." *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006)



Appellate Case: 22-2495 Page: 36 Date Filed: 10/12/2022 Entry ID: 5206979

(quoting *Hanil Bank v. Pt. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 131 (2d Cir. 1998)). By contrast, "tangential commercial activities to which the 'acts' forming the basis of the claim have only an attenuated connection" do not satisfy the "connection" requirement. *Garb*, 440 F.3d at 587. Thus, to satisfy the "connection" requirement, there must be a "substantive connection" or "causal link" between the conduct that the suit is "based upon" and some "commercial activity" of a foreign state—which, in this case, include "running a health care system, researching viruses, operating social media platforms, and producing and exporting PPE." Add. 32; R. Doc. 61, at 32.

This "substantive connection" and "causal link" between Defendants' tortious conduct and those commercial activities is clear and manifest. This is true even if this Court accepts the district court's artificially narrow definition of the Complaint's "gravamen," which focuses solely on Defendants' failure to contain the virus and concealment of the outbreak. Add. 30; R. Doc. 61, at 30. Defendants' concealment activities have a clear and obvious "substantive connection" and "causal link" to (1) the bioengineering and accidental release of the virus from the lab, which the concealment activities were designed to suppress; (2) the operation of the Wuhan health-care system, which was the central focus of Defendants' concealment efforts; (3) the operation of traditional and social-media platforms, which were also the focus of critical efforts to suppress the virus's transmissibility; and (4) the production,

purchasing, and import and export of medical equipment, which were the focus of the PPE-hoarding scheme that arose directly from Defendants' misfeasance in concealing the virus's transmissibility.

The "substantive connection" and "causal link," moreover, are even more direct and obvious if one includes the critical allegations about the accidental release of the virus from the WIV lab, and the PPE-hoarding scheme itself, as part of the "core" or "gravamen" of the Complaint's allegations. Those activities are deeply intertwined with, and indistinguishable from, commercial activities. The Complaint alleges that the virus accidentally escaped from a WIV lab that was engaged in bioengineering viruses as for-profit commercial activities. Further, the PPE-hoarding scheme itself was a massive commercial activity, which involved buying up high-quality American PPE and exploiting the shortage by profiteering off of low-quality PPE. Again, both of these activities are directly linked with the Defendants failure to contain the virus and concealment of the virus's transmissibility from the world.

The district court admitted, "to be sure, a link and connection is more apparent in these circumstances than … was at issue in *Garb*," *i.e.*, the only case the district court discussed in any detail on this point. Add. 32; R. Doc. 61, at 32. But the district court nevertheless reasoned that finding FSIA's exception applicable here "seems inconsistent with the restrictive theory of sovereign immunity." Add. 33; R.

Doc. 61, at 33. The district court cited no statutory language or case law to support this vague concern; instead, it cited a student note in a law review from 1983 advocating that courts should disregard the plain language of FSIA in favor of the statutory "purposes" and "general policies," as discerned by academics. *See id.* (quoting David A. Brittenham, Note, *Foreign Sovereign Immunity and Commercial Activity: A Conflicts Approach*, 83 Colum. L. Rev. 1440, 1452 (1983)).

This was error. The plain language of the FSIA, not the academically intuited "purpose" of Congress, is what governs. "[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see also Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment) ("We are governed by laws, not by the intentions of legislators."). "In statutory construction, we begin with the language of the statute. If the statutory language is unambiguous and the statutory scheme is coherent and consistent—as is the case here—the inquiry ceases." *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) (cleaned up). The degree to which "Congress intended" to codify the "restrictive" theory of sovereign immunity is reflected in the plain language of the statute, not some "purpose" or "general policy" that contradicts the plain meaning. When interpreting FSIA, courts should not "read additional unexpressed requirements into the statute rather than rely on its plain meaning," because "[t]aken



Appellate Case: 22-2495 Page: 39 Date Filed: 10/12/2022 Entry ID: 5206979

together, *Weltover* and *Keller* counsel us that we may not read anything *into* the statute, but must, quite simply, read it." *Rote*, 816 F.3d at 394 & n.7.

In any event, even if the supposed "general policies" or "purposes" of the statute could defeat its plain meaning, they would not do so here. Applying the plain and ordinary meaning of "in connection with" falls squarely within the statute's purpose. The district court provided no support for its generic conclusion that applying the "connection" requirement here "seems inconsistent with the restrictive theory of sovereign immunity." Add. 33; R. Doc. 61, at 33. The court overlooked that FSIA's adoption of the so-called "restrictive" theory of sovereign immunity was intended to expand the class of foreign-sovereign activities that are subject to suit in American courts. *See, e.g.*, *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486–87 (1983) (noting that the "restrictive theory" of sovereign immunity was an *expansion* of liability from the prior regime where "the State Department ordinarily requested immunity in all actions against friendly foreign sovereigns"). Congress's inclusion of the phrase "in connection with" in the third clause of § 1605(a)(2)'s commercial-activity exception, therefore, should be construed as reflecting the fundamental purpose of the statute to define the precise circumstances when foreign sovereign immunity applies.

The only other authority the district court cited on this point was *Eisenberg*, which dismissed a *pro se* lawsuit brought by a federal prisoner. *Eisenberg v.*

*People's Republic of China Through Wang*, No. 22-CV-10194-IT, 2022 WL 1591541, at *1 (D. Mass. May 19, 2022). *Eisenberg* cited, as its principal authority supporting dismissal of the *pro se* prisoner's lawsuit, the non-substantive order of *the court below* calling for supplemental briefing on jurisdictional issues, which did not address the merits (and which *Eisenberg* mischaracterized). *See id.* at *2. For the court below to cite another district court citing a supplemental-briefing order of *the court below* that did not address the merits was logically circular. In addition, *Eisenberg* cited a line of district-court decisions dismissing other *pro se* prisoner lawsuits, which have limited persuasive value for similar reasons. *Id.* at *4.

The only substantive analysis that *Eisenberg* performed was a one-sentence, conclusory statement: "Zeroing in, the core of Eisenberg's claim is not 'based upon' commercial activity, but rather political, non-commercial activity of the PRC." *Id.* at *5 (citation omitted). But Missouri here invokes the *third clause* of § 1605(a)(2), which does not require the suit to be "based upon" commercial activity—it requires the suit to be "based upon" sovereign conduct performed "*in connection with*" commercial activity. § 1605(a)(2) (emphasis added). As multiple courts have observed, "Congress made an important distinction between the first clause of section 1605(a)(2) and the second and third clauses," because under the latter clauses, the plaintiffs' "claims need not be 'based upon' commercial activity; they must merely be based upon acts made 'in connection with' such activity." *Adler*,



Appellate Case: 22-2495 Page: 41 Date Filed: 10/12/2022 Entry ID: 5206979

107 F.3d at 726 (quoting *Nelson*, 507 U.S. at 358); *see also Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1290 (3d Cir. 1993) (similar observation). *Eisenberg* simply overlooked the phrase "in connection with" in the third clause, and thus its analysis is erroneous and unpersuasive.

Where, as here, the "acts complained of" are thoroughly and inextricably intertwined with commercial activities, the requisite "substantive connection" or "causal link" is plainly established. *Adler*, 107 F.3d at 726. *Adler* held that Nigeria's actions of fraudulently inducing the plaintiff to enter a scam agreement, breaching the agreement, and fraudulently inducing the plaintiff to pay millions of dollars under the agreement, were "substantively connected to the underlying agreement," which was a commercial activity. *Id.* So also here, "the acts complained of" are thoroughly and inextricably intertwined with, and closely causally connected to, commercial activities—indeed, in large part, they *are* commercial activities. Defendants' conduct of releasing the deadly virus from the Wuhan Institute of Virology was substantively and causally connected to their commercial research that bioengineered the virus at the laboratory. *See* App. 15, 20, 47, 50–51; R. Doc. 1, ¶¶ 27–28, 52, 152–57, 169. Defendants' conduct of suppressing and concealing critical information about the virus's initial outbreak in Wuhan health-care facilities—to which information they had unique, exclusive, and privileged access, because they operate the Wuhan health-care facilities—was directly and causally



Appellate Case: 22-2495 Page: 42 Date Filed: 10/12/2022 Entry ID: 5206979

connected to their operation of the Wuhan health-care facilities. *See* App. 9–11, 50–51; R. Doc. 1, ¶¶ 1, 7, 169. Defendants' conduct of buying high-quality PPE from the United States, selling defective PPE to the United States, and profiteering on PPE is directly and causally connected with (indeed, it is identical to) their commercial activity of buying and selling PPE from and to the United States. *See* App. 41, 42, 52; R. Doc. 1, ¶¶ 132–33, 136–37, 175–76. Defendants' conduct of controlling information on traditional and social-media networks to conceal and suppress critical information about the virus's initial outbreak is directly and causally connected to their ownership and operation of such traditional and social-media networks. *See* App. 9–11, 17–18, 26–27; R. Doc. 1, ¶¶ 1, 7, 40, 79–81.

The court below dismissed *Adler* on the ground that "[i]f *Adler* is applied mechanically, to its logical extreme, courts would have to conclude that no matter how sovereign the 'act' is, and no matter how much the core and gravamen of the complaint is based on that sovereign act, suit may be brought under the FSIA *as long as the complaint pleads that the act was made in connection with commercial activity*." Add. 31; R. Doc. 61, at 31 (emphasis added). But that is exactly what the statute says: "A foreign state shall not be immune … in any case … in which the action is based upon … an act outside the territory of the United States *in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States*." § 1605(a)(2) (emphasis added). The district court's

desire to avoid applying *Adler* "mechanically" is simply an attempt to avoid the statute's plain meaning. *See Mont v. United States*, 139 S. Ct. 1826, 1832 (2019) ("The Court has often recognized that 'in connection with' can bear a 'broad interpretation.'") (collecting cases interpreting diverse statutes).

## II. In the Alternative, the Non-Commercial-Tort Exception Applies to Missouri's Complaint.

Even if the commercial-activity exception did not apply, Missouri pleaded in the alternative that the case falls within the non-commercial-tort exception set forth in 28 U.S.C. § 1605(a)(5). As relevant here, that exception applies to claims for money damages resulting from personal injury, death, or loss of property occurring in the United States and "caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment," but it does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform *a discretionary function* regardless of whether the discretion be abused." § 1605(a)(5)(A) (emphasis added). The district court held that the non-commercial-activity exception did not apply because the case fell within the discretionary-function exception-to-the-exception. Add. 35–37; R. Doc. 61, at 35–37. That was incorrect.

The discretionary-function exception applies to "acts that are discretionary in nature, acts that involve an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991). But "even assuming the challenged conduct

involves an element of judgment, it remains to be decided whether that judgment is of the kind that the discretionary function exception was designed to shield." *Id.* at 322–23. "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." *Id.* at 323 (cleaned up). Such actions involve "judgment as to which of a range of permissible courses is the wisest." *Id.* at 325.

Thus, "[t]he discretionary function exception applies only to conduct that involves the permissible exercise of policy judgment." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 539 (1988). Conduct that "did not involve any permissible exercise of policy judgment" falls outside the discretionary-function exception. *Gaubert*, 499 U.S. at 326 (quoting *Berkovitz*, 486 U.S. at 538 n.3). "If the judgment is 'susceptible to policy analysis,' the discretionary function exception applies." *Croyle ex rel. Croyle v. United States*, 908 F.3d 377, 381 (8th Cir. 2018) (quoting *Gaubert*, 499 U.S. at 325). But the exception does not apply where "no conceivable policy choice would allow" the alleged conduct. *Id.*

This Court "recognizes" that certain actions—such as "failure to act after notice of an employee's ongoing illegal conduct"—are "not a 'choice based on plausible policy considerations.'" *Id.* at 382 (quoting *Tonelli v. United States*, 60

F.3d 492, 496 (8th Cir. 1995) ("Failure to act after notice of illegal action does not represent a choice based on plausible policy considerations.")). "In sum, the discretionary function exception insulates the Government from liability if the action challenged in the case involves the permissible exercise of policy judgment." *Berkovitz*, 486 U.S. at 537. As the case cited by the district court holds, "the critical question" is "whether some plausible policy justification could have undergirded the challenged conduct." *Fagot Rodriguez v. Republic of Costa Rica*, 297 F.3d 1, 10–11 (1st Cir. 2002)

Accidentally leaking the virus from WIV's lab did not involve "some plausible policy justification." *Id.* Nor did the subsequent campaign of misfeasance, concealment, reckless disregard for the lives of millions, and illegal profiteering off PPE. The district court reasoned that "delaying information, providing misinformation, suppressing information, censoring information, allowing massive public gatherings, allowing unencumbered travel, and publicly punishing citizens who sought to warn the public about the [deadly, highly contagious] virus," Add. 37; R. Doc. 61, at 37, reflected "choice[s] based on plausible policy considerations." *Croyle*, 908 F.3d at 382. This is plainly incorrect, and certainly insupportable when the Complaint is viewed in the light most favorable to Missouri. Unlike *Croyle*, this case does not involve a policy-laden task of "[b]alancing safety, reputational interests, and confidentiality." *Id.* There are no "plausible policy considerations"



Appellate Case: 22-2495 Page: 46 Date Filed: 10/12/2022 Entry ID: 5206979

that could possibly justify the egregious misconduct alleged in the Complaint, which resulted in the deaths of millions. If "[f]ailure to act after notice of illegal action" by an employee "does not represent a choice based on plausible policy considerations," *Tonelli*, 60 F.3d at 496, neither does releasing a deadly virus and then engaging in egregious misconduct to render its worldwide circulation inevitable.

At very least, the district court should not have made this determination—that the misconduct alleged "involve[d] the permissible exercise of policy judgment," *Berkovitz*, 486 U.S. at 537—based solely on the allegations in the Complaint. As discussed further below, Missouri was not required to plead facts establishing that its case did not fall within the exception-to-the-exception in § 1605(a)(5)(A). Defendants had the burden of coming forward with evidence that their authority somehow encompassed the "discretion" to accidentally release a deadly virus, conceal the virus's transmissibility from the public and the world until it was too late to stop a deadly global pandemic, and cynically profiteer off that suppressed information by hoarding the world's PPE supply. Defendants did not do so, because they defaulted instead of defending the suit. There was no basis for a *sua sponte* jurisdictional dismissal on this ground.

## III. The Nongovernmental Defendants Are Not Cloaked in FSIA Immunity.

Because case falls within FSIA's exceptions to foreign sovereign immunity, the district court should not have dismissed the case against any Defendant. Even if all nine Defendants were "foreign state[s]" under FSIA, the Court would still have jurisdiction over their claims. But the district court also erred by treating the three nongovernmental Defendants—Communist Party of China (CPC), Chinese Academy of Sciences (CAS), and Wuhan Institute of Virology (WIV)—as "foreign states" in the first place. None of these Defendants satisfies FISA's definition of "foreign state" based on the Complaint's allegations, so FSIA immunity does not apply to them at all.

### A. Defendants Bear the Burden of Proving Foreign-State Status.

As an initial matter, the district court misallocated the burden of proof. "The foreign state has the burden of proving that it is entitled to sovereign immunity." *Gen. Elec.*, 991 F.2d at 1380. It is only "[o]nce a foreign state makes a prima facie showing of immunity" that "the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies." *Id.* at 1382. Nine other circuits employ the same burden-shifting framework, which places the initial burden to prove foreign-state status on the *defendant*. *See O'Bryan v. Holy See*, 556 F.3d 361, 376 (6th Cir. 2009); *Orient Min. Co. v. Bank of China*, 506 F.3d 980, 991 (10th Cir. 2007); *Enahoro v. Abubakar*, 408 F.3d 877, 882 (7th Cir. 2005); *Virtual Countries,*



Appellate Case: 22-2495 Page: 48 Date Filed: 10/12/2022 Entry ID: 5206979

*Inc. v. Republic of S. Africa*, 300 F.3d 230, 241-42 (2d Cir. 2002); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727-28 (9th Cir. 1997); *Fed. Ins. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1285 n.13 (3d Cir. 1993); *Gerding v. Republic of France*, 943 F.2d 521, 525 (4th Cir. 1991); *Forsythe v. Saudi Arabian Airlines Corp.*, 885 F.2d 285, 289 n.6 (5th Cir. 1989) (per curiam); *Schubarth v. Fed. Republic of Germany*, 891 F.3d 392, 398 (D.C. Cir. 2018); *Bell Helicopter Textron, Inc. v. Islamic Republic of Iran*, 734 F.3d 1175, 1183 (D.C. Cir. 2013). Based on this framework, Missouri had no burden to plead or prove facts establishing WIV, CAS, and CPC were *not* "foreign states." *Gen. Elec.*, 991 F.2d at 1380, 1382. If those entities contend they are "foreign states" cloaked in FSIA immunity, they must come forward and raise the issue. None ever did so.

*General Electric*'s burden-shifting framework, moreover, is consistent with fundamental fairness. Prior to discovery, domestic plaintiffs are often at an informational disadvantage on factual issues related to immunity. Foreign-entity defendants, by contrast, have unique knowledge of their own status with their respective governments. *See Qatar v. First Abu Dhabi Bank PJSC*, 432 F. Supp. 3d 401, 411 (S.D.N.Y. 2020) (placing the initial burden on the defendant "makes sense" because the foreign defendant and its government "frequently possess most of the information needed to establish organ status"). "These foreign entities obviously have little incentive to provide information that will help the plaintiff's case, and it

may be difficult for the plaintiff to obtain discovery from them." *Alejandre v. Telefonica Larga Distancia, de Puerto Rico, Inc*., 183 F.3d 1277, 1285 n.19 (11th Cir. 1999). Accordingly, it makes sense that the foreign entity that claims to be a "foreign state" must come forward with evidence that it is, rather than forcing the plaintiff to plead and prove a negative.

Nonetheless, the district court held that the State was required to plead—and ultimately to prove—that FSIA immunity does not apply. The district court's reasons for disregarding binding authority from this Court, not to mention the consensus of nine other Circuits, appear in a single paragraph. Add. 9–10; R. Doc. 61, at 9–10. None of these reasons is persuasive.

First, the district court observed that it was "conducting a *sua sponte*" inquiry into its subject-matter jurisdiction because "no defendant has appeared to assert its sovereign immunity." Add. 9; R. Doc. 61, at 9. But it would be perverse if a party could unload its burden of proof by failing to appear. The fact that the court has an obligation to consider subject-matter jurisdiction *sua sponte* just means that subject-matter jurisdiction cannot be waived or forfeited. It entails nothing about who bears the burden of proof. As the Supreme Court has explained, burdens of production and persuasion are "presumptive devices." *Ruan v. United States*, 142 S. Ct. 2370, 2380 (2022). Absent evidence (in the case of a factual challenge) or allegations (in the case of a facial challenge) to the contrary, a court must *presume* that the



Appellate Case: 22-2495 Page: 50 Date Filed: 10/12/2022 Entry ID: 5206979

defendants are not foreign states. This is true regardless of whether the court is considering the matter *sua sponte* or on a party's motion.

Second, the district court cited a case not involving FSIA for the general proposition that "[t]he party seeking to invoke jurisdiction . . . carries the burden, which may not be shifted to another party." Add. 9; R. Doc. 61, at 9 (quoting *Jones v. United States*, 727 F.3d 844, 846 (8th Cir. 2013)). But is well established that this generalization admits of exceptions. For example, preemption under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, is jurisdictional, *Richardson v. BNSF Ry.*, 2 F.4th 1063, 1070 (8th Cir. 2021), but the defendant bears the burden of proving it applies, *Jenisio v. Ozark Airlines, Inc. Ret. Plan for Agent & Clerical Emps.*, 178 F.3d 970, 973 (8th Cir. 1999). Preemption under the National Labor Relations Act, 29 U.S.C. § 151 *et seq.*, is jurisdictional, *Gerhardson v. Gopher News Co.*, 698 F.3d 1052, 1057 (8th Cir. 2012), but the defendant bears the burden of proving it applies, *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 394–96 (1986). Mootness by voluntary cessation is jurisdictional, *Hickman v. Missouri*, 144 F.3d 1141, 1142–44 (8th Cir. 1998), but the defendant bears the burden of proving it applies, *Prowse v. Payne*, 984 F.3d 700, 703 (8th Cir. 2021). The bar on second-or-successive *habeas* petitions is jurisdictional, *Burton v. Stewart*, 549 U.S. 147, 152 (2007) (per curiam), but the government bears the burden of proving it applies, *Thomas v. Superintendent*, 136 F.3d 227, 229 (2d Cir. 1997). So too, although foreign-state

status is jurisdictional, *Gen. Elec.*, 991 F.2d at 1380, the defendant bears the burden of proving it applies, *id.*

Finally, the district court cited *Eisenberg* for the proposition that "a plaintiff must demonstrate that the court has jurisdiction to hear the claim and that a sovereign is not immune from suit." Add. 9–10; R. Doc. 61, at 9–10 (citing *Eisenberg*, 2022 WL 1591541, at *3). But all *Eisenberg* held was that, *given that the PRC was a foreign state*, the plaintiffs bore the burden of proving that an exception to foreign sovereign immunity applied. *See* 2022 WL 1591541, at *3. The question here is who bears the burden of showing whether a defendant is a foreign state in the first place. *Eisenberg*—an order from a district court in one of the two Circuits that has yet to adopt *General Electric*'s burden-shifting framework—left this question open. *See id.* at *3 (recognizing that "the burden of production and persuasion has not been decided by the First Circuit"). The Eighth Circuit has not. *Gen. Elec.*, 991 F.2d at 1380–82.

The district court committed a crucial error in misallocating the burden of proof. A facial jurisdictional review requires the court to base its decision on the allegations in the complaint construed in the light most favorable to the plaintiff. If Missouri had the burden to prove Defendants are not foreign states, this would mean that the court must conclude that Defendants *are* foreign states unless Missouri's allegations, construed in the light most favorable to Missouri, establish that they are

*not*. Instead, because Defendants bear the burden, it means that the court must conclude that Defendants are *not* foreign states unless Missouri's allegations, construed in the light most favorable to Missouri, establish that they *are*. In other words, to warrant treating Defendants as foreign states at this stage in the litigation, Missouri's allegations must be sufficient for *Defendants* to carry *their* burden of proving they are foreign states. This standard is met as to the governmental Defendants: in its complaint, Missouri candidly acknowledged that these entities qualify as "foreign states" for FSIA purposes, triggering the burden to plead as to these entities that an exception to foreign sovereign immunity. But, as explained below, the standard is not met as to any non-governmental Defendant.

Thus, the district court erred by misallocating the burden of proof on foreign-state status for the non-governmental Defendants, CAS, WIV, and CPC. In doing so, the district court moved the goalposts and sprang an unfair trap on Missouri. As the district court noted, Missouri included no allegations in the Complaint to establish that CAS, WIV, and CPC are *not* foreign states—because it had no burden to do so. But, as Missouri advised the district court when it was weighing whether to consider facts outside the Complaint, there were many facts in the public record that Missouri *could* have alleged to establish the non-foreign-state status of CAS, WIV, and CPC. *See* App. 175–85; R. Doc. 54, at 5–15. For example, as Missouri noted, the Constitutions of both the PRC and CPC insist that the Communist Party



Appellate Case: 22-2495 Page: 53 Date Filed: 10/12/2022 Entry ID: 5206979

is distinct from the PRC, and the CPC and PRC hold themselves out to the world as distinct entities. App. 175–77; R. Doc. 54, at 5–7. Likewise, the Chinese Academy of Sciences publicly insists that it is distinct from the PRC, and it publicly emphasizes both its independence from the PRC and the non-governmental, commercial roles that it performs. App. 177–82; R. Doc. 54, at 7–12 (quoting, *inter alia*, Xiaoxuan Li et al., *Scientific Advice in China: the Changing Role of the Chinese Academy of Sciences*, PALGRAVE COMMUNICATIONS (July 12, 2016), *at* https://www.nature.com/articles/palcomms201645). Similarly, WIV (which is a "research institute" of CAS) holds itself out as an independent entity performing commercial functions, not an agency of a foreign state. App. 183–85; R. Doc. 54, at 13–15. Missouri, therefore, had ample basis to allege facts establishing that these three Defendants are not "foreign states." Missouri did not allege these additional facts because it was not required to do so under governing law. To dismiss Missouri's Complaint with prejudice because its pleading relied the burden-shifting framework of this Circuit and nine other Circuits was fundamentally unfair.

### B. Missouri's Complaint Does Not Carry Nongovernmental Defendants' Burden to Show Foreign Statehood.

Under a proper allocation of the burden of proof, because all Defendants had defaulted and failed to assert their own foreign-state status, the district court should have considered only whether Missouri's Complaint—viewed in the light most

favorable to Missouri—establishes on its face that CPC, CAS, and WIV are "foreign states." Plainly, it does not.

A foreign state is "a body politic that governs a particular territory." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010). As relevant here, FSIA provides that (1) "political subdivision[s] of a foreign state," (2) "organ[s] of a foreign state or political subdivision thereof," and (3) entities "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof" are also to be treated as "foreign state[s]" for immunity purposes. 28 U.S.C. § 1603(a), (b)(2). Entities in the second and third categories are defined as "agenc[ies] or instrumentalit[ies]." 28 U.S.C. § 1603(b).

***Political subdivision.*** Political subdivisions consist of "governmental units beneath the central government, including local governments." *Garb v. Republic of Poland*, 440 F.3d 579, 596 (2d Cir. 2006) (quoting H.R. Rep. No. 94–1487, at 15, reprinted in 1976 U.S.C.C.A.N. at 6613); *see also Political Subdivision*, BLACK'S LAW DICTIONARY 1197 (11th ed. 2019) (defining "political subdivision" as "[a] division of a state that exists primarily to discharge some function of local government").

***Organ.*** "[T]here is no clear test for determining whether an entity is an organ of a state." *Janvey v. Libyan Inv. Auth.*, 840 F.3d 248, 259 (5th Cir. 2016). Courts have articulated overlapping, nonexhaustive lists of relevant factors, including



Appellate Case: 22-2495 Page: 55 Date Filed: 10/12/2022 Entry ID: 5206979

(1) the circumstances of and reasons for the entity's creation, (2) the purpose of the entity's activities, (3) the degree of independence from state supervision, (4) the entity's ownership structure, (5) the entity's employment practices, (6) the level of state financial support, (7) the entity's rights and obligations under foreign law, and (8) how the entity is treated under foreign law. *Compare Janvey*, 840 F.3d at 259 (focusing on factors (1), (3), (5), (7), and (8)), *and Filler v. Hanvit Bank*, 378 F.3d 213, 217 (2d Cir. 2004) (same), *with USX Corp. v. Adriatic Ins.*, 345 F.3d 190, 209 (3d Cir. 2003) (focusing on factors (1)–(7)), *with Patrickson v. Dole Food Co.*, 251 F.3d 795, 807 (9th Cir. 2001) (focusing on factors (1)–(3) and (5)–(7)).

### 1. The Complaint does not carry CAS's or WIV's burden.

The district court concluded that CAS and WIV are FSIA "foreign states" because they are political subdivisions of PRC, an actual foreign state. Add. 22; R. Doc. 61, at 22. But nothing in the Complaint suggests that CAS or WIV is a "governmental unit[]" within the PRC. *Garb*, 440 F.3d at 596. On the contrary, the Complaint alleges that WIV "is a research institute that studies virology and related topics," while CAS is the PRC's "national academy of the natural sciences" and an incubator for technology startups. App. 15–16; R. Doc. 1, ¶¶ 27, 31–32. Construing these allegations in *any* light, let alone the light most favorable to Missouri, yields no inference that CAS and WIV are divisions of the state akin to "local governments." *Garb*, 440 F.3d at 596.

In concluding otherwise, the district court relied on caselaw about whether entities *that concededly constitute FSIA "foreign states"* should be classified as political subdivisions or as agencies or instrumentalities.[2] Add. 12; R. Doc. 61, at 12. (citing *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 214 (4th Cir. 2011)). That caselaw is relevant only to how to classify an entity once it is *assumed* that it constitutes an FSIA "foreign state." *See Wye Oak*, 666 F.3d at 214 (taking as given that an entity was a "state[] component" to which "FSIA applie[d]" and analyzing "whether [it wa]s a political subdivision or an agency or instrumentality"). That caselaw does not determine whether CAS or WIV constitute FSIA "foreign states" in the first place. To rely on this caselaw is like reasoning that zebras are distinguished from horses by their stripes, and thus a tiger must be a zebra because it has stripes.

In the alternative, the district court concluded that "if CAS and WIV are not political subdivisions," they are PRC organs.[3] Add. 23; R. Doc. 61, at 23. The district court based this conclusion on two points. First, it noted that "[t]he complaint

[2] The classification matters because an agency or instrumentality is "a separate legal person" from the foreign state whereas a political subdivision is not. *Wye Oak*, 666 F.3d at 214. "This distinction has consequences" not relevant here for "an entity's rights and responsibilities under the FSIA." *Id.*

[3] The district court did not hold—and nothing in complaint suggests—that CAS or WIV falls within the third category of FSIA "foreign states," i.e., entities "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof." § 1603(b).

allegations show that WIV and CAS did not function independently, but at the behest of the foreign-state defendants, regarding the timing, nature, and extent of information about the virus." *Id.* Second, it took "judicial notice of a Congressional report on China's organizational structure, which describes how China's State Council 'carries out the administrative functions of the Chinese government' and lists CAS in a chart of 'Institutions Directly Under the State Council.'" *Id.*

These points are insufficient to support the district court's conclusion. The district court's points bear on at most two of the foreign-state-organ factors: the purpose of the entity's activities and the degree of government supervision. Even as to these factors, they are minimally probative—and, at least as to the purpose factor, they are outweighed by other allegations in the Complaint. The purpose and supervision factors concern the defendant's activities *generally*, not just the alleged tortious activity. *See, e.g.*, *USX*, 345 F.3d at 211 (examining the defendant's activities since its inception). That CAS and WIV acted in concert with PRC in committing the tortious acts of which Missouri complains implies nothing about the purpose of, or degree of state supervision over, CAS's and WIV's activities more generally. Construed favorably to Missouri, the allegations that WIV "is a research institute that studies virology and related topics" and that conducted "commercial research on viruses" indicate that the purpose of WIV's activities was generally *not* governmental but rather academic and commercial. App. 15, 17–18; R. Doc. 1,

¶¶ 27, 40. Similarly, the allegations that CAS conducted "commercial research on viruses," "seeks to 'commercialize' its discoveries," and boasts about spinning off "hundreds of companies" suggests that CAS's activities are generally geared to academic and commercial ends. App. 15–18; R. Doc. 1, ¶¶ 31, 32, 40. As for the listing of CAS "[u]nder the "State Council," Add. 23; R. Doc. 61, at 23, this means little without more facts about the State Council and its relationship with CAS.

Thus, the district court's basis for its state-organ conclusion consisted of a pair of observations that were minimally probative, relevant only to the purpose and supervision factors, and heavily outweighed by other allegations. About the other factors, the district court said nothing—presumably because *the Complaint* says nothing: nothing about CAS's or WIV's creation, ownership structure, employment practices, financing, legal rights and obligations, or treatment in Chinese law. Had the district court been as diligent about uncovering judicially noticeable facts in Missouri's favor as in Defendants' favor, it might have noticed that WIV received foreign funding.[4] And had it surveyed the sources cited in the Complaint, *see Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (explaining that sources "embraced by the complaint are not matters outside the pleading"), the district court might have noticed that one of them credits France with helping to "set up the [WIV]

[4] *See SARS-CoV-2 and NIAID-supported Bat Coronavirus Research*, NAT'L INST. OF HEALTH (2021), https://www.niaid.nih.gov/diseases-conditions/coronavirus-bat-research.

lab,"[5] and that CAS self-describes not as a government agency but as a "think tank" that "encourag[es] academic openness," prioritizes "international cooperation," and forges "ties with the industrial sector to conduct joint research and commercialize discoveries."[6] But even without these countervailing facts and allegations that the district court disregarded, its mixed signals on two factors and silence on six others is plainly insufficient to carry the burden of showing that a multi-factor test is satisfied. Missouri's complaint simply does not allege facts sufficient to carry for Defendants their burden of showing CAS and WIV are PRC organs.[7]

### 2. The Complaint does not carry CPC's burden.

As for CPC, the district court conceded that it "does not neatly fit within any of FSIA's definitions of foreign state." Add. 18; R. Doc. 61, at 18. Rightly so. CPC is not a division of PRC akin to a local government; hence, it is not a "political subdivision." Nor is CPC an agent or instrumentality. *See Tachiona v. United*

---

[5] *Sources believe coronavirus outbreak originated in Wuhan lab as part of China's efforts to compete with US*, FOX NEWS (Apr. 15, 2020), https://www.foxnews.com/politics/coronavirus-wuhan-lab-china-compete-us-sources (cited in App.20; R. Doc. 1, at 12 n.8)

[6] About Us, Chinese Academy of Sciences, http://english.cas.cn/about_us/introduction/201501/t20150114_135284.shtml (cited in App. 16; R. Doc. 1, at 8 n.4).

[7] Even if CAS were a state organ (and it is not), it would not follow that WIV is a state organ entitled to FSIA immunity. Although the Complaint alleges that CAS "administers" WIV, FSIA extends only to organs of actual foreign states (i.e., bodies politic governing a particular territory) and their political subdivisions, not organs *of organs* of foreign states and their political subdivisions. *See Filler*, 378 F.3d at 219–20; *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1462 (9th Cir. 1995).

*States*, 386 F.3d 205, 209, 222 (2d Cir. 2004) (stating that the "political party whose members have ruled Zimbabwe since 1980" was "a private entity and not an agency or instrumentality of a foreign state").

The state-organ factors confirm that CPC is not an agent or instrumentality under the organ prong. If anything, CPC's power weighs against treating it as a state organ because it suggests that CPC controls and supervises PRC, rather than vice-versa. *See* App. 13; R. Doc. 1, ¶ 18 (alleging that CPC is PRC's "sole governing party" whose "General Secretary becomes [PRC's] president"). Additionally, the complaint alleges that CPC is not "owned by the PRC or a political subdivision of PRC." App. 13; R. Doc. 1, ¶ 19. Furthermore, CPC predated the PRC and was instrumental in the PRC's creation. CONST. OF PEOPLE'S REPUBLIC OF CHINA pmbl. (recognizing that PRC was founded "under the leadership of" CPC); *cf. Effie Film, LLC v. Pomerance*, 909 F. Supp. 2d 273, 299 (S.D.N.Y. 2012) (noting that the rules of evidence "permit[] judicial notice of historical facts"). Finally, the constitutions of both PRC and CPC emphasize that CPC is subject to Chinese law just as any other "organization or individual." CONST. OF PEOPLE'S REPUBLIC OF CHINA art. V; *see also* CONST. OF COMMUNIST PARTY OF CHINA pmbl., http://news.xinhuanet.com/english/download/Constitution_of_the_Communist_Party_of_China.pdf. *See Gil v. Rodriguez*, 184 F. Supp. 2d 1221, 1225 n.3 (M.D. Fla. 2002) (taking judicial notice of foreign constitutional and other legal

materials). Thus, the supervision, ownership-structure, purpose-of-creation, and legal-treatment factors all weigh against treating CPC as a PRC organ. And nothing in the Complaint suggests that any factor weighs in favor of treating CPC as a PRC organ.

As for the ownership prong, the allegation that CPC is not "owned by the PRC or a political subdivision of PRC," App. 13; R. Doc. 1, ¶ 19, implies that PRC is not an entity "a majority of whose shares or other ownership interest is owned by a foreign state or political subdivision thereof," § 1603(b)(2).

Recognizing that CPC is neither a political subdivision nor an agency or instrumentality, the district court resorted to classifying CPC as an actual "foreign state," that is, "a body politic that governs a particular territory." Add. 18; R. Doc. 61, at 18. The district court never explained how this remarkable conclusion squares with PRC's status as a Chinese sovereign. CPC cannot be the superior sovereign; that would mean PRC is a political subdivision, and the Complaint alleges that PRC is a "nation." App. 13; R. Doc. 1, ¶ 17. Nor can the CPC be the subordinate sovereign; that would mean CPC is a political subdivision, which (as noted above) it is not. The only remaining possibility is that CPC and PRC share power as dual sovereigns, like federal and state governments in the United States. Missouri is aware of no judicially noticeable source, let alone anything in the Complaint, that supports this novel theory of Chinese politics.



Appellate Case: 22-2495 Page: 62 Date Filed: 10/12/2022 Entry ID: 5206979

## CONCLUSION

This Court should reverse the judgment the district court.

Dated: October 11, 2022

Respectfully submitted,

**ERIC S. SCHMITT**
*Attorney General*

/s/ *D. John Sauer*
D. John Sauer, MO 58721
Solicitor General
*Counsel of Record*
Justin D. Smith, MO 63253
First Assistant Attorney General

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that this motion complies with the typeface and formatting requirements of Fed. R. App. P. 27 and 32, and that it contains 12,804 words in 14-point Times New Roman font, as determined by the word-count feature of Microsoft Word. Both the brief and addendum have been scanned for viruses and are virus free.

*/s/ D. John Sauer*

## CERTIFICATE OF SERVICE

I hereby certify that on October 11, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

*/s/ D. John Sauer*



Appellate Case: 22-2495 Page: 64 Date Filed: 10/12/2022 Entry ID: 5206979