No. 22-2495

IN THE

# United States Court of Appeals
FOR THE EIGHTH CIRCUIT

THE STATE OF MISSOURI,
*Plaintiff-Appellant,*

---v.---

THE PEOPLE'S REPUBLIC OF CHINA, et al.,
*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI - CAPE GIRARDEAU
(1:20-cv-00099-SNLJ)

**BRIEF OF THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW
AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANTS-APPELLEES AND
IN SUPPORT OF AFFIRMANCE**

Jackie M. Kinder
WATTERS WOLF BUB & HANSMANN
600 Kellwood Pkwy, St. 120
Saint Louis, Missouri 63017
636-798-0639 – Phone
636-798-0693 – Fax
jkinder@wwbhlaw.com
*Counsel for Amicus Curiae*
*The China Society of Private International Law*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................... ii

STATEMENT OF INTEREST ................................................................1

SUMMARY ...........................................................................................2

ARGUMENT .........................................................................................3

   I.    FSIA and its Protections..............................................................3

   II.   The status of CAS, WIV and CPC as "foreign states"..................4

      A.   The burden of proving foreign-state status. ..............................4

      B.   CAS and WIV are organs of the Chinese state. ........................5

      C.   CPC has the status of a foreign state.........................................9

   III.   The FSIA's commercial activity exception to immunity does not apply. ..12

      A.   The alleged commercial activities of Defendants are not commercial in nature.......................................................................................13

      B.   The allegations are not based upon acts that have substantive or causal connection to the alleged commercial activities of Defendants. .....................17

      C.   The Complaint does not allege any act of the named Defendants caused any "direct effect" in the United States. ..........................................19

   IV.   The FSIA's noncommercial tort exception to immunity does not apply....22

      A.   The discretionary function exception to the noncommercial tort exception applies to grant immunity. ...............................................................24

   V.   Conclusion.................................................................................27

CERTIFICATE OF COMPLIANCE....................................................29

CERTIFICATE OF SERVICE .............................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adler v. Fed. Republic of Nigeria*,
    107 F.3d 720 (9th Cir. 1997) ................................................................. 18

*Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*,
    600 F.3d 171 (2d Cir. 2009) ................................................... 14, 17, 18

*Argentine Republic v. Amerada Hess Shipping Corp.*,
    488 U.S. 428 (1989) ......................................................................... 3, 24

*Brewer v. Socialist People's Republic of Iraq*,
    890 F.2d 97 (8th Cir.1989) ...................................................................... 4

*California Dept. of Water Resources v. Powerex Corp.*,
    533 F.3d 1087 (9th Cir. 2008) ................................................................. 5

*Chen v. China Cent. TV*,
    2007 U.S. Dist. LEXIS 58503 (S.D.N.Y., Aug. 9, 2007) ................................... 11

*Croyle by & through Croyle v. United States*,
    908 F.3d 377 (8th Cir. 2018) ...................................................... 25, 26, 27

*Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada*,
    600 F.3d. 661 (D.C. Cir. 2010) ............................................................. 20

*Doe 1 v. State of Israel*,
    400 F.Supp.2d 86 (D.D.C. 2005) ......................................................... 23

*Doe v. Fed. Democratic Republic of Ethiopia*,
    851 F.3d 7 (D.C. Cir. 2017) ........................................................... 23, 24

*El Omari v. Kreab (USA) Inc.*,
    735 F. App'x 30 (2d Cir. 2018) ............................................................ 16

*Elbasir v. Kingdom of Saudi Arabia*,
   468 F. Supp. 2d 155 (D.D.C. 2007) .................................................................... 14

*Filler v. Hanvit Bank*,
   378 F.3d 213 (2d Cir. 2004)................................................................................. 6

*Gen. Elec. Cap. Corp. v. Grossman*,
   991 F.2d 1376 (8th Cir. 1993)............................................................................. 4

*Guirlando v. T.C. Ziraat Bankasi A.S.*,
   602 F.3d 69 (2d Cir. 2010)........................................................................... 20, 21

*In re Terrorist Attacks on September 11, 2001*,
   714 F.3d 109 (2d Cir. 2013)............................................................................... 23

*Joseph v. Off. of Consulate Gen. of Nigeria*,
   830 F.2d 1018 (9th Cir. 1987)........................................................................... 25

*Kato v. Ishihara*,
   360 F.3d 106 (4th Cir. 2004)............................................................................. 16

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
   213 F.3d 841 (5th Cir. 2000).............................................................................. 6

*OBB Personenverkehr AG v. Sachs*,
   577 U.S. 27 (2015) ....................................................................................... 3, 18

*O'Bryan v. Holy See*,
   556 F.3d 361 (6th Cir. 2009).............................................................................. 23

*Opati v. Republic of Sudan*,
   140 S. Ct. 1601 (2020) ........................................................................................ 4

*Patrickson v. Dole Food Company*,
   251 F.3d 795 (9th Cir. 2001).............................................................................. 6

*Princz v. Fed. Republic of Germany*,
   26 F.3d 1166 (D.C. Cir. 1994) .......................................................................... 20

iii

*Qandah v. Johor Corp.*,
  799 F. App'x 353 (6th Cir. 2020) ........................................................ 6

*Republic of Argentina v. Weltover*,
  504 U.S. 607 (1992) ................................................................ 13, 20

*Samantar v. Yousuf*,
  560 U.S. 305 (2010) ....................................................................... 9

*Saudi Arabia v. Nelson*,
  507 U.S. 349 (1993) ...................................................... 4, 13, 15, 19

*Stirling v. China*,
  Case No. 3:20-cv-00713 (D. Or. Aug. 14, 2020, adopted Sept. 21, 2020).......... 27

*Terenkian v. Republic of Iraq*,
  694 F.3d 1122 (9th Cir. 2012)............................................................. 20

*Underhill v. Hernandez*,
  168 U.S. 250 (1897) ...................................................................... 16

*United States v. Gaubert*,
  499 U.S. 315 (1991) ................................................................. 25, 26

*USX Corp. v. Adriatic Ins. Co.*,
  345 F.3d 190 (3d Cir. 2003)............................................................... 6

*Verlinden B.V. v. Central Bank of Nigeria*,
  461 U.S. 480................................................................................ 4, 5

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*,
  493 U.S. 400 (1990) ...................................................................... 17

**Statutes**

28 U.S.C. § 1330(a) ......................................................................... 5

28 U.S.C. § 1603(a) ......................................................................... 5

iv

28 U.S.C. § 1603(b) ......................................................................... 5

28 U.S.C. § 1605(a)(2) ...................................................................... 12

28 U.S.C. § 1605(a)(5) ................................................................. 23, 24

28 U.S.C. § 1605(a)(5)(A) ................................................................. 24

**Other Authorities**

Audit Law of PRC ............................................................................... 8

Constitution of The Chinese Academy of Sciences ........................... 7, 8, 9

Fighting COVID-19: China in Action, THE STATE COUNCIL INFORMATION
    OFFICE, available at http://english.scio.gov.cn/whitepapers/2020-
    06/07/content_76135269_3.htm ................................................... 9

H.R. REP. 94-1487, 1976 U.S.C.C.A.N. 6604 ................................... 6

Chimène Keitner, *Missouri's Lawsuit Doesn't Abrogate China's Sovereign
    Immunity*, Just Security (Apr. 22, 2020), available at
    https://www.justsecurity.org/69817/missouris-lawsuit-doesnt-abrogate-chinas-
    sovereign-immunity/ ................................................................. 11

Paul Larkin, *Suing China Over COVID-19,* 100 B. U. L. REV. ONLINE 91 (2020)
    ..................................................................................... 10, 11, 26

Restatement (Fourth) of the Foreign Relations Law § 454 .................. 18

Restatement (Second) of Foreign Relations Law § 4 ........................... 9

XIANFA (1982) (China) ..................................................................... 11

v

**STATEMENT OF INTEREST**

The China Society of Private International Law ("The Society") is an academic society formed under Chinese law and dedicated to research and discussion of private international law issues. Members of the Society include international law professors, scholars, consultants, and lawyers. The Society is interested in the law and theory of foreign sovereign immunity and the furtherance of relations between China and the United States. It has been following this case in view of the foreign sovereign immunity issues it raises and its potential effects on Sino-U.S. relations.

Per this Court's Order dated August 19, 2022, the Society has authority to file this amicus brief. No party's counsel authored the brief in whole or in part. No party or a party's counsel contributed money that was intended to fund preparing or submitting the brief. No person--other than the Society, its members, or its counsel--contributed money that was intended to fund preparing or submitting the brief.

**SUMMARY**

The Society submits that the district court in its Memorandum and Order, dated July 8, 2022, correctly found that all named Defendants-Appellees, including the Communist Party of China (CPC), Chinese Academy of Sciences (CAS), and Wuhan Institute of Virology (WIV), have the status of "foreign states" under the Foreign Sovereign Immunities Act (FSIA), and that no exception to FSIA sovereign immunity applies. Consequently, the district court's dismissal for lack of subject matter jurisdiction is correct and should be affirmed.

#30065173 v1

## ARGUMENT

In this novel case against nine (9) Chinese entities for their alleged mishandling of the COVID-19 pandemic, the State of Missouri (hereinafter "Missouri") appealed from the dismissal of its action for lack of subject matter jurisdiction in the context of the foreign sovereign immunity. The Foreign Sovereign Immunities Act (FSIA) "provides the sole basis for obtaining jurisdiction over a foreign state in the courts of this country." *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 30 (2015) (quoting *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 (1989)). Missouri is fatally flawed in showing that the district court has jurisdiction under the FSIA to hear the claim, therefore this Court should affirm the dismissal.

### I.      FSIA and its Protections

Since its inception, the United States has recognized the sovereign nature of foreign states and limited those scenarios where actions can be brought against them. Indeed, the United States has always respected various forms of particular state immunity. This not only protects the foreign states, but also protects the United States from being sued in foreign courts when foreign states authorize similar lawsuits in retaliation through their domestic legislation. Additionally, reciprocal immunity prevents the United States' domestic policies and policy-making processes from being challenged in foreign courts.

3

The FSIA codified the longstanding presumption of immunity for any foreign state. Under FSIA, "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993); *Opati v. Republic of Sudan*, 140 S. Ct. 1601, 1605 (2020).

## II.    The status of CAS, WIV and CPC as "foreign states"

Only three of the Defendants' statuses were at issue in the district court – CAS, WIV and CPC.  We submit that they are all "foreign states" for purposes of FSIA.

### A. The burden of proving foreign-state status.

Missouri argues in the Appellant's Brief that it had no burden to prove that CAS, WIV, and CPC were not "foreign states," and that those entities must appear and raise the issue. App. Br. at 41 (citing *Gen. Elec. Cap. Corp. v. Grossman*, 991 F.2d 1376, 1380 (8th Cir. 1993)). However, *General Electric* does not involve the issue of non-appearing defendants. *General Electric* cites *Brewer v. Socialist People's Republic of Iraq*, 890 F.2d 97, 100–01 (8th Cir.1989), which held:

> Generally, the party seeking to invoke immunity is allocated the burden of proof on that issue. … Yet, even if a party fails to enter an appearance and assert its claim of immunity, a court must determine whether immunity is available pursuant to the FSIA. *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494 n. 20, 103 S.Ct. 1962, 1971 n. 20, 76 L.Ed.2d 81 (1983).

*Brewer*, 890 F.2d at 100–01. In *Verlinden*, the Supreme Court noted:

4

Under [FSIA], however, subject matter jurisdiction turns on the existence of an exception to foreign sovereign immunity, 28 U.S.C. § 1330(a). Accordingly, even if the foreign state does not enter an appearance to assert an immunity defense, a District Court still must determine that immunity is unavailable under the Act.

*Verlinden*, 461 U.S. at 494 n. 20.

Accordingly, requiring the court to determine *sua sponte* whether immunity is available to a non-appearing party while demanding said party to appear first and argue it has "foreign state" status is illogical. To determine whether a party has the status of "foreign state" as defined under § 1603 is a step in analyzing whether FSIA immunity is available, not a separate burden of proof for non-appearing parties.

**B. CAS and WIV are organs of the Chinese state.**

Under FSIA, the term "foreign state" refers not only to the state itself, but also to its political subdivisions, as well as agencies or instrumentalities. § 1603(a). An agency or instrumentality of a foreign state is a separate entity that is not a U.S. citizen or created under the laws of a third country, and that is either (1) majority owned by a foreign state or political subdivision thereof or (2) an "organ" of a foreign state or political subdivision thereof. § 1603(b). The term "organ" should be defined broadly to be consistent with Congress's intent. *California Dept. of Water Resources v. Powerex Corp.*, 533 F.3d 1087, 1098 (9th Cir. 2008). This is because "entities which meet the definition of an 'agency or instrumentality of a foreign state'

5

could assume a variety of forms." H.R. REP. 94-1487, 15, 1976 U.S.C.C.A.N. 6604, 6614.

Several jurisdictions hold that whether an entity is an "organ of foreign state" depends on whether the entity engages in public activity on behalf of foreign government. *Patrickson v. Dole Food Company*, <u>251 F.3d 795, 807</u> (9th Cir. 2001); *USX Corp. v. Adriatic Ins. Co*., <u>345 F.3d 190, 208</u> (3d Cir. 2003). The relevant factors include (1) circumstances surrounding entity's creation; (2) purpose of its activities; (3) its independence from government; (4) level of government financial support; (5) its employment policies; and (5) its obligations and privileges under state law. *Patrickson*, <u>251 F.3d at 807</u>. *See also Qandah v. Johor Corp.*, <u>799 F. App'x 353, 358</u> (6th Cir. 2020) (similar factors are "most commonly used"); *Filler v. Hanvit Bank*, <u>378 F.3d 213, 217</u> (2d Cir. 2004); *Kelly v. Syria Shell Petroleum Dev. B.V.*, <u>213 F.3d 841, 846</u>–47 (5th Cir. 2000).

**(1) CAS.** Based on the factual allegations in the Complaint, CAS "is the national academy of the natural sciences for the PRC and describes itself as 'the linchpin of China's drive to explore and harness high technology and the natural sciences for the benefit of China.'" App. 15-16; R. Doc. 1, ¶ 31. The Complaint further alleges that CAS "acted in concert with" and "as agents and/or principals of" the Chinese Government Defendants and the Party. App. 16; R. Doc. 1, ¶ 34. These allegations on their face show that CAS is an organ of the Chinese State.

6

Possibly an example of "artful pleading" to avoid dismissal, Missouri's Complaint states very little about CAS's relationship with the Chinese government. CAS was established by the PRC's Central Government in November 1949,[1] shortly after the latter's founding. Accordingly, the Chinese state created CAS for national scientific research purposes. CAS engages in public activity in the form of scientific research on behalf of the Chinese government.

Regarding the Chinese state's supervision, Missouri alleges that CPC "exercised direction and control over the actions of all other Defendants[,]" including CAS. *Id.* at ¶ 20. This factual allegation effectively acknowledges that the Chinese state actively supervised CAS. This is also consistent with CAS's status in PRC's constitutional framework. In this regard, the district court notably took proper judicial notice of the State Council's direct control over CAS. App. 286; R. Doc. 61, at 23. As a related matter, the President and vice presidents of CAS are appointed by the State Council.[2] CAS's President reports to the State Council.[3]

---

[1] Art. 3, Constitution of The Chinese Academy of Sciences, CHINESE ACADEMY OF SCIENCES, https://www.cas.cn/zj/yk/201410/t20141017_4225627.shtml (last visited October 16, 2022) (China).
[2] *Id.* Art. 8.
[3] *Id.* Art. 9.

7

In terms of government financial support, CAS's income is partially based on government funds.[4] As a public institution,[5] CAS's revenues and expenditures are required to be audited by government auditors,[6] further indicating limited independence from the government. As such, CAS qualifies as an organ of the Chinese state. Moreover, the court correctly concluded that CAS is a political subdivision of the State.

**(2) WIV.** The Complaint alleges that WIV is administered by CAS and "is a research institute that studies virology and related topics." App. 15-16; R. Doc. 1, ¶¶ 27, 33. It also alleges that the Chinese Government Defendants and the Party engaged in "research" through the Institute. *Id.* at ¶ 152. Under CAS's Constitution, an institute is a national scientific research and development institution.[7] The creation of an institute like WIV needs approval by authorities.[8] Therefore, like CAS, WIV was also created by the Chinese state for national scientific research purposes.

In terms of the Chinese state's supervision, by alleging that CPC "exercised direction and control over the actions of all other Defendants[,]" App. 14; R. Doc. 1,

---

[4] *See id.* Art. 50.
[5] *Id.* Art. 5(5).
[6] Art. 21, Audit Law of PRC.
[7] Art. 28, Constitution of The Chinese Academy of Sciences, CHINESE ACADEMY OF SCIENCES, https://www.cas.cn/zj/yk/201410/t20141017_4225627.shtml (last visited October 16, 2022) (China).
[8] *Id.* Art. 27.

#30065173 v1

¶ 20, Missouri also acknowledges that WIV as one of the Defendants was also actively supervised by the Chinese state. In this regard, the CAS Constitution provides that the head of WIV is appointed by CAS and reports to the President of CAS.[9] Additionally, the Complaint alleges that Defendants shared the genome sequence with the international community on January 12, 2020. App. 33; R. Doc. 1, ¶ 102. In this regard, WIV was one of the agencies designated by the National Health Commission to submit the genome sequence to the WHO.[10] This further shows that WIV engages in public activity on behalf of the Chinese government. Based on the foregoing, WIV qualifies as an organ of the Chinese state.

Finally, as the case with CAS, the district court properly found that WIV is a political subdivision of the state.

## C. CPC has the status of a foreign state.

Next, we analyze CPC's status based on the Complaint's allegation while noting CPC's nature and role in the Chinese political and legal framework. The Supreme Court held that "[t]he term 'foreign state' on its face indicates a body politic that governs a particular territory." *Samantar v. Yousuf*, 560 U.S. 305, 314 (2010) (citing Restatement (Second) of Foreign Relations Law § 4 (defining "state" as "an

---

[9] *Id.* Art. 29.
[10] *See* Fighting COVID-19: China in Action, THE STATE COUNCIL INFORMATION OFFICE, http://english.scio.gov.cn/whitepapers/2020-06/07/content_76135269_3.htm (last visited October 16, 2022).

#30065173 v1

entity that has a defined territory and population under the control of a government and that engages in foreign relations")). In this case, the Complaint alleges that:

- The People's Republic of China (PRC) is a "communist nation";

- CPC "is the sole governing party within China, and the Communist Party's General Secretary becomes the president of the PRC";

- CPC "exercised direction and control over the actions of all other Defendants";

- CPC and the Chinese Government Defendants "acted in concert with one another and acted as agents and/or principals of one another".

App. 13-15; R. Doc. 1, ¶¶ 17-18, 20, 26. Therefore, Missouri essentially and effectively alleges that CPC exercises the paramount state power and controls the actions of the named Chinese Government Defendants, in the territory of China. Consequently, based solely on the factual allegations in the Complaint, CPC fits in the very definition of a "foreign state" according to *Samantar*.

U.S. scholars also agree in this regard. "[I]f the Communist Party is calling all the shots in China, then the *CPC* is the "state" for purposes of the FSIA, not the PRC, and the PRC and every other defendant is an arm of the state." Paul Larkin*, Suing China Over COVID-19,* 100 B. U. L. REV. ONLINE 91, 99 (2020) (emphasis original). "If the Chinese Communist Party can order the PRC what to do and not do, then the CPC is the relevant "state" for purposes of the FSIA. It cannot be sued, and none of the other defendants can be sued either because they are components of

10

the state." *Id.* at 100. *See also* Chimène Keitner, *Missouri's Lawsuit Doesn't Abrogate China's Sovereign Immunity*, Just Security (Apr. 22, 2020), available at https://www.justsecurity.org/69817/missouris-lawsuit-doesnt-abrogate-chinas-sovereign-immunity/ (last visited October 16, 2022) ("In China, the CCP [Chinese Communist Party] arguably *is* the state.").

The conclusion that CPC essentially exercises the highest state power in the Chinese state is consistent with Chinese law. The Preamble to the PRC's Constitution provides that CPC has been and will continue leading the Chinese nation. XIANFA pmbl. (1982) (China). "The socialist system is the basic system of the People's Republic of China. The leadership of the Communist Party of China is the defining feature of socialism with Chinese characteristics." *Id.* Art. 1, Sec. 2.

In addition, U.S. courts have considered CPC to have the status of a foreign state. In a case against state-owned television station China Central Television (CCTV), a federal court held that it is an agency or instrumentality of the PRC by reasoning that, inter alia, CCTV is the "mouthpiece of the ***Chinese Communist Party***[,]" *Chen v. China Cent. TV*, 2007 U.S. Dist. LEXIS 58503 (S.D.N.Y., Aug. 9, 2007) (emphasis added), indicating that the court considered CPC as part of the foreign state.

The bottom line is this: Missouri cannot maintain that CPC exercises state power and deny that it is part of the Chinese state at the same time. By virtue of the

#30065173 v1

Complaint's allegations that CPC exercises paramount state power, CPC must be recognized as covered by the FSIA and entitled to immunity.

Therefore, all named Defendants have the status of "foreign states" under the FSIA.

### III.    The FSIA's commercial activity exception to immunity does not apply.

Missouri claims that the commercial-activity exception under the FSIA applies in this case and that Defendants are not immune. *See* App. 17-18; R. Doc. 1, ¶¶ 38-40. The commercial-activity exception provides that a foreign state shall not be immune where –

> the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States **in connection with** a **commercial** activity of the foreign state elsewhere and that act causes a **direct effect** in the United States[.]

28 U.S.C. § 1605(a)(2) (emphases added).

Missouri relies solely on the third clause of the commercial activity exception, *see* App. 17; R. Doc. 1, ¶ 40. Under the third clause, Missouri is required to show that (1) Defendants engaged in some "commercial activity" outside the United States; (2) the action is based upon an act outside the United States "in connection with" such commercial activity; *and* (3) the act caused a "direct effect" in the United States. Missouri failed to show any of the foregoing. Each of these is therefore an *alternative* basis for finding that the commercial-activity exception does not apply.

12

**A. The alleged commercial activities of Defendants are not commercial in nature.**

The Complaint lists four allegedly "commercial" activities:

> (1) operation of the healthcare system in Wuhan and throughout China; (2) commercial research on viruses by the Wuhan Institute and Chinese Academy of Sciences; (3) the operation of traditional and social media platforms for commercial gain; and (4) production, purchasing, and import and export of medical equipment, such as personal protective equipment ("PPE"), used in COVID-19 efforts.

App. 17-18; R. Doc. 1, ¶ 40. These activities are not commercial in nature and cannot serve as the basis for the commercial-activity exception.

A foreign state engages in commercial activity under the FSIA "when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it." *Republic of Argentina v. Weltover*, 504 U.S. 607, 614 (1992); *Saudi Arabia v. Nelson*, 507 U.S. 349, 360 (1993). To determine whether a foreign state's activity is "commercial" for purposes of the FSIA, one must ask "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type of actions* by which a private party engages in 'trade and traffic or commerce.'" *Weltover*, 504 U.S. at 614 (emphasis added).

While we agree with the district court that "the gravamen of the complaint-- the actual conduct that injured plaintiff … is not the type of conduct by which a private party engages in 'trade and traffic or commerce' and thus it is not commercial activity," App. 293; R. Doc. 61, at 30, we analyze the four activities in turn.

13

**(1) Operation of the healthcare system.** Multiple jurisdictions have held that the "commercial activity" exception of the FSIA does not encompass the administration of a government program to provide for the health and welfare of a sovereign's citizens and residents. *Elbasir v. Kingdom of Saudi Arabia*, 468 F. Supp. 2d 155, 161–62 (D.D.C. 2007). *See also Anglo-Iberia Underwriting Mgmt. Co. v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir. 2009) ("actions in connection with the administration of Indonesia's national health insurance program are sovereign in nature and do not suffice to bring [defendant] within the 'commercial activity' exception to the FSIA"). As such, Defendants' alleged operation of the healthcare system in China is not a commercial activity for purposes of FSIA.

In addition, even if accepted as true, Missouri's allegations that the Chinese government controlled the flow of information our of healthcare facilities, managed a public health crisis from the top down, and punished the doctors, indicate that the acts associated with the operation of the healthcare system are not commercial.

**(2) "Commercial" research on viruses by WIV and CAS.** Merely labeling the research "commercial" does not make it so. Indeed, the Complaint specifically refers to the fact that CAS or WIV were founded to conduct research for China's benefit, as agents for the Chinese Government. Moreover, there are no allegations of any specific commercial activities of CAS or WIV, relating to COVID-19. Rather the Complaint shows that the alleged research was done at the behest of the Chinese

government.  In addition, as discussed above, CAS and WIV were created by the Chinese state for national scientific research purposes. The type of actions they engage in, using state assets and resources, are not the type that private researchers do or are able to do.

**(3) Operation of traditional and social media platforms for commercial gain.** Again, Missouri's reference to "commercial gain" seems to be a way of trying to shoehorn its allegations into the commercial-activity exception. Missouri refers to media not operated by Defendants and refers to no commercial activity of Defendants, but rather to alleged government regulation in the form of censorship concerning COVID-19, which it claims constituted a "coverup" causing harm. *See* App. 26-27; R. Doc. 1, ¶¶ 79-81. Thus, the claim is actually based on an alleged exercise or abuse of the government's sovereign power in the form of government censorship.

"[A] foreign state's exercise of the power of its police has long been understood for purposes of the restrictive theory as peculiarly sovereign in nature." *Saudi Arabia v. Nelson*, 507 U.S. 349, 361 (1993). "Exercise of the powers of police … is not the sort of action by which private parties can engage in commerce." *Id.* As the Court noted in *Nelson*, "legislation or the expulsion of an alien, or denial of justice cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such." *Id.* at 362.  In sum, government

15

censorship is a form of exercise of police power. As such, the alleged operation of traditional and social media platforms does not constitute "commercial activity" to satisfy the "commercial activity" exception.

### **(4) Production, purchasing, and import and export of medical equipment.**

Again, the Complaint does not identify what entities are producing, purchasing, importing, or exporting PPE. Missouri is not basing its claims on the commercial activities of these enterprises, but on the sovereign regulatory actions of the Chinese state. Indeed, these are actions taken by the state in regulating what can be done with these particular items.

Much of Missouri's "hoarding" claim is based on allegations concerning a Chinese government ban on exports of PPE. *See* App. 52; R. Doc. 1, ¶ 175. However, an export ban is a quintessential sovereign act that can only be conducted by a sovereign state and is not itself commercial activity. Similarly, a foreign state's promotion of commercial activity is a "quintessential" government function and therefore not itself commercial activity. *El Omari v. Kreab (USA) Inc*., 735 F. App'x 30 (2d Cir. 2018); *Kato v. Ishihara*, 360 F.3d 106, 112 (4th Cir. 2004).

Further, an export ban is an act of a state whose legitimacy cannot be attacked. "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory." *Underhill v. Hernandez*,

16

168 U.S. 250, 252 (1897). The act of state doctrine requires reviewing courts to "deem valid" the acts of foreign sovereigns taken within their own jurisdictions. *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 409 (1990). In every case where the act of state doctrine is applicable, "the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Id.* at 405. The point of this doctrine recognizes why sovereign activities are entitled to immunity under the FSIA. The bases for the immunity under FSIA and the recognition of acts of state are the same.

In conclusion, Missouri's claims are based on alleged acts or omissions that are sovereign in nature and not commercial. Missouri essentially asserts that Defendants did not exercise ***sovereign*** powers to prevent the rise of or prevent the spread of the coronavirus. Absent any commercial activity, there can be no jurisdiction under the commercial activity exception.

**B. The allegations are not based upon acts that have substantive or causal connection to the alleged commercial activities of Defendants.**

Even if the Court finds that Missouri alleges commercial activities, the commercial-activity exception still does not apply because its allegations are not "based on" acts taken "in connection" with a commercial activity. The statutory term "in connection" as used in the FSIA is a term of art, and courts interpret it narrowly. *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir.

17

2010). In order to satisfy that requirement, the wrongful act causing the alleged harm must have a "substantive connection" or "causal link" to the asserted commercial activity. *Anglo-Iberia*, 600 F.3d at 178; *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720 (9th Cir. 1997); Restatement (Fourth) of the Foreign Relations Law § 454, note 7. "[T]angential commercial activities to which the 'acts' forming the basis of the claim have only an attenuated connection," *Anglo-Iberia*, 600 F.3d at 179 (internal citation omitted), therefore cannot provide a basis for FSIA jurisdiction.

More specifically, as the district court correctly noted, this means that the claim must be "based on" acts taken in connection with the commercial activity. Pursuant to the Supreme Court's holding in *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), "[r]ather than individually analyzing each of [Missouri's] causes of action," the court must "zero[] in on the core of [the] suit: [Defendants'] sovereign acts that actually injured" Missouri, 577 U.S. at 35, and see if there is a connection sufficient between the claim and the actions taken.

Missouri fails to show how the gravamen of this case has any substantive connection to the alleged four commercial activities. What Missouri claims caused its injuries (or what their claims are "based" on) includes the alleged failure to contain the coronavirus, and the alleged concealment and/or misinformation about critical facts of the virus, such as its transmissibility. These acts are not based on any of the alleged commercial activities and there is no "substantive connection"

18

between them. Indeed, as discussed, the core of this claim is not *based on* commercial activity at all, but rather political, non-commercial activity.

Missouri argues that the district court erroneously left out two other elements of the alleged misconduct – (1) the release of the virus from a commercial lab[11] and (2) the hoarding of PPE. App. Br. at 9. This is not a fair characterization of the court's order. The court simply found that the allegations related to commercial research of the coronavirus and hoarding of PPE depended on Defendants' initial acts or omissions in containing the virus. Put simply, even if Missouri's allegations are accepted as true, and Defendants' "activities led to the conduct that eventually injured" Missouri, those activities do not form the basis of Missouri's suit. *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993).

### C. The Complaint does not allege any act of the named Defendants caused any "direct effect" in the United States.

Missouri's failure to allege any "direct effect" is another alternative basis for finding that the commercial-activity exception does not apply. An effect was direct if it followed as an ***immediate*** consequence of the defendant's activity in the foreign

---

[11] Of note, Missouri alters or at least misrepresents its factual allegations in the Complaint. The Complaint alleges that Defendants engaged in ***research*** of viruses and acknowledges that there are multiple theories on the origin of the virus, but does not affirmatively claim that Defendants ***released*** the coronavirus. *See* App. 20, 47; R. Doc. 1, ¶¶ 51-52 (two theories of the origin of the virus), 153 ("one likely source for the origin"), 157 ("coverup about the origins"). However, Missouri now alleges that Defendant "***release[d]*** the virus from the WIV's commercial lab," when it actually refers to the Complaint's allegation about research of the virus.

state. *Republic of Argentina v. Weltover*, 504 U.S. 607, 618 (1992). A "direct effect" is one without any intervening element, but rather flows in a straight line without deviation or interruption. *Princz v. Fed. Republic of Germany*, 26 F.3d 1166, 1172 (D.C. Cir. 1994). "'[T]he requisite immediacy' is lacking where the alleged effect 'depend[s] crucially on variables independent of' the conduct of the foreign state." *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 75 (2d Cir. 2010) (internal citation omitted). The Ninth Circuit observed that "[t]he requirement that an effect be 'direct' indicates that Congress did not intend to provide jurisdiction whenever the ripples caused by an overseas transaction manage eventually to reach the shores of the United States." *Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1134–35 (9th Cir. 2012) (internal citation and quotation marks omitted).

It should be noted that harm to a U.S. citizen in and of itself is not sufficient to satisfy the direct effect requirement. *Cruise Connections Charter Mgmt. 1, LP v. Attorney General of Canada,* 600 F.3d. 661, 665 (D.C. Cir. 2010). Indeed, "[i]f a loss to an American individual and firm resulting from a foreign tort were sufficient standing alone to satisfy the direct effect requirement, the commercial activity exception would in large part eviscerate the FSIA's provision of immunity for foreign states." *Guirlando*, 602 F.3d at 79 (internal citation omitted).

In *Guirlando*, the plaintiff wished to open an individual account at a bank in Turkey to deposit a check drawn on her bank in New York. *Id.* at 72. The Turkish

bank refused but persuaded her to open a joint account with her husband. *Id.* She did not know that her money could be withdrawn from the Turkish bank account by her husband alone without her consent. *Id.* After the funds arrived from New York, the bank informed the husband, who stole the money. *Id.* She then returned to the U.S. and sued the Turkish bank, alleging that she suffered financial loss. *Id.* There was no dispute as to the status of the Turkish bank as a foreign state. *Id.* at 74.

Regarding the alleged financial loss, the court noted that the mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States under the commercial activity exception. *Id.* at 78 (internal citation omitted). In addition, the court held that the transfer of funds from the New York bank account to the Turkish bank account did not have a direct effect in the U.S., because transfer is not what caused the plaintiff's injury; what caused her loss was her husband's withdrawal of the funds from the Turkish account without her consent, which occurred after the money had left the United States. *Id.* at 80.

Just like the transfer of funds outside the U.S. does not have a direct effect in the U.S., merely because Missouri allegedly sustained certain harms associated with the pandemic does not mean Defendants' conducts have a direct effect in the United States. A chain of causal events had to occur between the alleged acts of the Defendants and the alleged harms sustained by Missouri. According to the

21

allegations, the coronavirus originated in China when some persons there became infected. Even if one or more of Defendants committed some tortious act or omission, causing this causal chain to start, the harm suffered in the United States would not have occurred without various intervening acts, including but not limited to: interpersonal transmission through international travels, the U.S. authorities' failure to take effective measures to suppress the spread of the coronavirus in the U.S., the effectiveness of independent efforts of businesses regarding containment and quarantine, and individuals' inadequate or improper preventive measures against COVID-19. Hence the harms allegedly suffered by Missouri as a consequence of the large number of infections contracted *within* the United States are caused by independent intervening factors and conducts and cannot qualify as a "direct effect."

## IV.    The FSIA's noncommercial tort exception to immunity does not apply.

Also at issue is whether the noncommercial tort exception under the FSIA applies to bar immunity. This is a separate independent basis for a finding that there is no immunity in this case.   The relevant portion of this exception is as follows:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
> …
> (5) not otherwise encompassed in [the commercial activity exception to immunity], in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, ***occurring in the United States*** and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment … .

28 U.S.C. § 1605(a)(5) (emphasis added). "The phrase 'occurring in the United States' is no mere surplusage." *Doe v. Fed. Democratic Republic of Ethiopia*, 851 F.3d 7, 10 (D.C. Cir. 2017). Unlike the commercial activity exception, which inquires where the ***gravamen*** occurred, for the noncommercial-tort exception to apply, ***the entire tort***, including not only the injury but also the act precipitating that injury, must occur in the United States. *Id.* at 10, 12; *In re Terrorist Attacks on September 11, 2001*, 714 F.3d 109, 116 (2d Cir. 2013). Indeed, courts have consistently held this language requires that the tortious act *and* the injury must all occur in the United States. *See, e.g., Doe 1 v. State of Israel*, 400 F.Supp.2d 86, 108 (D.D.C. 2005); *O'Bryan v. Holy See*, 556 F.3d 361, 382 (6th Cir. 2009).

*Doe v. Ethiopia* is instructive. In that case, the plaintiff claimed that after he opened an attachment to an e-mail, his computer was infected with wiretapping virus. 851 F.3d at 8. The email was allegedly sent from either Ethiopia or London. *Id.* The plaintiff sued Ethiopia. *Id.* at 9. The district court dismissed the lawsuit for, inter alia, lack of subject-matter jurisdiction under FSIA. *Id.* The D.C. Circuit affirmed, holding the noncommercial-tort exception inapplicable because the "entire tort" did not occur in the United States. *Id.* at 10-12. The court reasoned:

> [W]hether in London, Ethiopia or elsewhere, the tortious intent aimed at [the plaintiff] plainly lay abroad and the tortious acts of computer programming likewise occurred abroad. Moreover, Ethiopia's placement of the [virus] on [the plaintiff's] computer, although

23

> completed in the United States when [the plaintiff] opened the infected
> e-mail attachment, began outside the United States. It thus cannot be
> said that the entire tort occurred in the United States.

*Id.* at 10. The court also considered legislative history, noting that "the 'Congress' primary purpose in enacting § 1605(a)(5) was to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law.'" *Id.* at 11 (citing *Amerada Hess Shipping Corp.*, 488 U.S. at 439–40). As such, the court held that the alleged cyberespionage "is a transnational tort over which we lack subject matter jurisdiction." *Id.* at 11.

Similary, in this action, all alleged acts and omissions that allegedly constitute torts according to Missouri occurred in China. In fact, the Complaint does not contain any reference to any acts or omissions by Defendants that occurred in the territory of the U.S. Accordingly, even though harms were allegedly sustained in the U.S., the entire tort did not occur in the U.S. Consequently, the noncommercial-tort exception does not apply to grant jurisdiction.

### A. The discretionary function exception to the noncommercial tort exception applies to grant immunity.

Finally, the discretionary function exception to the noncommercial tort exception also would bar suit. Under this exception, a foreign state is immune in "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function *regardless of whether the discretion be abused*[.]" 28 U.S.C. § 1605(a)(5)(A) (emphasis added). "The existence of a discretionary

24

function under the FSIA is generally analyzed under the principles developed pursuant to the Federal Tort Claims Act's ('FTCA') discretionary function exception." *Joseph v. Off. of Consulate Gen. of Nigeria*, 830 F.2d 1018, 1026 (9th Cir. 1987) (cited in *Croyle by & through Croyle v. United States*, 908 F.3d 377, 382 (8th Cir. 2018)).

The Supreme Court analyzed the FTCA discretionary function exception in *United States v. Gaubert*, 499 U.S. 315, 322 (1991). Pursuant to *Gaubert*, when established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion, for purposes of FTCA's discretionary function exception. *Id.* at 324. As such, for Missouri's Complaint to survive dismissal, Missouri carries the burden to "allege facts that would support finding that challenged actions are not kind of conduct that can be said to be grounded in policy of regulatory regime." *See id.* at 324-25. One researcher noted that Missouri failed to make such allegations:

> given Missouri's other allegations discussed above, the CPC and PRC had broad discretion to decide how to respond to the outbreak, and they directed every action that the other defendants took. … At a minimum, Missouri does not allege that China violated Chinese law in responding to the virus. In fact, Missouri does not identify, as the Supreme Court put it in *Gaubert,* any Chinese "statute, regulation, or policy" that "specifically prescribes a course of action for an employee to follow" in responding to the outbreak. If so, Chinese officials must have had discretion in how to respond and, to quote *Gaubert* again, "it must be

25

presumed that the agent's acts are grounded in policy when exercising that discretion." … Because Missouri has the burden of proof on that score, that omission would seem to foreclose the state's tort claim.

Paul Larkin, *Suing China Over COVID-19,* 100 B. U. L. REV. ONLINE 91, 111 (2020).

We agree with Mr. Larkin's opinion that the Defendants' acts alleged in the Complaint are discretionary. Even if Missouri's allegations are taken as true, Defendants had to decide how to manage a fast-moving pandemic while avoiding panic and unnecessary impact on domestic and global economy. As such, the decision-making at that time would require balancing various factors and interests, therefore "involve[ing] an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (explaining "discretionary").

*Croyle ex rel. Croyle v. United States*, 908 F.3d 377 (8th Cir. 2018), cited in Appellant's Brief, supports our point. There, this Court analyzed an Army medical center's decision to not warn of a priest's sexual propensities or to restrict his contact with children, in the employment context under the FTCA. This Court held that the decision is susceptible to policy analysis and the decision to warn is "at its core, a policy decision." *Id.* at 381. This Court noted that balancing safety, reputational interests, and confidentiality is the kind of determination the discretionary function exception was designed to shield. *Id.* at 382. As such, this Court held that the discretionary-function exception applies, noting that "[t]hough there may be

26

disagreements how these interests should be balanced, the FTCA does not empower judges to second guess such decisions via tort action." *Id.* (internal citations and quotation marks omitted).

Missouri argues that "[t]here are no 'plausible policy considerations' that could possibly justify the egregious misconduct alleged in the Complaint." Appellant's Brief, at 38-39. Missouri may disagree with how Defendants were balancing the interests at the beginning of the pandemic, but Missouri's disagreement is irrelevant. What is relevant is that Defendants' acts alleged in the Complaint are in the realm of policy choices. Therefore, the discretionary function exception to the noncommercial tort exception applies, granting immunity to Defendants. *See also Stirling v. China*, Case No. 3:20-cv-00713 (D. Or. Aug. 14, 2020, adopted Sept. 21, 2020) (dismissing claim against China for negligent release of coronavirus under discretionary function exception).

## V.    Conclusion

Based on the foregoing, all named Defendants have the status of "foreign states" under the FSIA. Neither the commercial-activity exception, nor the tort exception to the foreign sovereign immunity applies, and therefore subject-matter jurisdiction does not exist. This Court should affirm the dismissal.

27

Dated: October 19, 2022

Respectfully submitted,

**THE CHINA SOCIETY OF PRIVATE INTERNATIONAL LAW**
c/o International Law Institute of Wuhan University
Wuchang District
Wuhan, China 430072


**WATTERS WOLF BUB & HANSMANN**

*/s/ Jackie M. Kinder*
Jackie M. Kinder, #52810MO
600 Kellwood Pkwy, St. 120
Saint Louis, Missouri 63017
636-798-0639 – Phone
636-798-0693 – Fax
jkinder@wwbhlaw.com
*Counsel for Amicus Curiae*
*The China Society of Private International Law*

28

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limit of Fed. R. App. P. 29(a)(5) and 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 6,487 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, font size 14.

3.      This brief has been scanned for viruses and is virus-free.


*/s/ Jackie M. Kinder*


## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


*/s/ Jackie M. Kinder*

#30065173 v1